IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL ANDERSON, | : |
| JOEL PACHECO, by his parents and guardians, | : |
| ANA   and EMILIO PACHECO, and | : |
| VISION FOR EQUALITY, a non-profit | : |
| corporation, | : |
| | : |
| Plaintiffs, | : |
| v. | :   13-cv-5374 GAM |
| | : |
| THE FRANKLIN INSTITUTE, | : |
| Defendant. | : |
| | : |

## **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs through their counsel submit this Motion for Summary Judgment.   In support of this Motion, Plaintiffs submit the accompanying Memorandum of Law, Statement of Undisputed Facts, and Exhibits, which are incorporated by reference as if fully set forth herein.

Respectfully submitted,

Dated:  December 1, 2015

By:    /s/ Stephen F. Gold
Stephen F. Gold
PA Bar No. 09880
1709 Benjamin Franklin Parkway
Second Floor
Philadelphia, PA 19103
215-627-7100 ext. 227

/s/ Julie Foster
Julie Foster
PA Bar No 314007
Public Interest Law Center
1709 Benjamin Franklin Parkway
Second Floor
Philadelphia, PA 19103
215-627-7100

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I, Stephen F. Gold, hereby certify that a true and correct copy of the Motion and Memorandum of Law were filed electronically and is available for viewing and downloading from the ECF system of the U.S. District Court for the Eastern District of Pennsylvania, and that I served the same via electronic filing on December 1, 2015 upon the following:

Anne Marie Estevez, aestevez@morganlewis.com

Beth S. Joseph, bjoseph@morganlewis.com

Cailin Heilig, cheilig@morganlewis.com

*/s/ Stephen F. Gold*

Stephen F. Gold

December 1, 2015

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL ANDERSON, | : |
| JOEL PACHECO, by his parents and guardians, | : |
| ANA   and EMILIO PACHECO, and | : |
| VISION FOR EQUALITY, a non-profit | : |
| corporation, | : |
| | : |
|       Plaintiffs, | : |
| v. | : 13-cv-5374 GAM |
| | : |
| | : |
| THE FRANKLIN INSTITUTE, | : |
| | : |
|       Defendant. | : |
| | : |
| | : |

**TABLE OF CONTENTS**

I.   SUMMARY OF FACTS ............................................................................................. 1

II.   ARGUMENT ......................................................................................................... 4

   A.   Standard for Summary Judgment ......................................................................... 4

   B.   Summary of Legal Argument ............................................................................... 5

   C.   Plaintiffs' Legal Argument .................................................................................. 9

     1.   Defendant FI Discriminates against  Plaintiffs with Disabilities by Denying them the Opportunity to Participate and Benefit Equal to Nondisabled .............................. 11

     2.   Defendant Discriminates in Refusing to Modify Its Policy To Achieve Equal Opportunity to Enjoy the Museum's Activities and Programs ............................................ 17

     3.   Waiving Double Admission Fees Is Not a Fundamental Alteration of  the FI's Mission or Program and FI's Refusal to Modify Its Policy Violates the ADA ................... 24

   III.   CONCLUSION ................................................................................................. 38

# TABLE OF AUTHORITIES

**Cases**

*Addiction Specialists, Inc. v. The Township of Hampton and the Commonwealth of Pennsylvania*, 411 F.3d 399 (3d Cir. 2005 ................................................................ 11

*Alexander v Choate*, 469 U.S. 287, 301 (1985) ........................................... 11, 12, 14, 17

*Alumni Cruises, LLC v. Carnival Corp.*, 987 F. Supp. 2d 1290 (S.D. Fla. 2013) ................ passim

*Am. Council of the Blind v. Paulson*, 173-74, 525 F.3d 1256 (D.C. Cir. 2008) .................... 14, 24

*Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263 (3d Cir. 2008) ........................................ 4

*Dare v. California, Dep't of Motor Vehicles*, 191 F.3d 1167 (9th Cir. 1999) ........................... 21

*Davison v. Hart Broadway, LLC*, No. S-07-1894 LKK/CMK, 2009 U.S. Dist. LEXIS 48572 (E.D. Cal. May 26, 2009) ................................................................... 20

*Fisher v. Colorado Dept. of Health*, 335 F. 3d 1175 (10th Cir. 2003) ................................. 32

*Fortyune v. American Multi–Cinema, Inc.*, 364 F.3d 1075 (9th Cir. 2004) .................... 25, 26, 27

*Fredrick L. v. DPW*, 364 F.3d 487 (3d Cir. 2004) ...................................................... 11, 31

*Helen L. v. DiDario*, 46 F.3d 325 (3d Cir. 1995) ....................................................... 12

*Hovsons, Inc.  v. Township of Brick and Zoning Board of Adjustment of the Township of Brick*, 89 F.3d 1096 (3d Cir. 1996) ............................................................ 33

*Independent Living Resources v. Oregon Arena Corp.*, 982 F. Supp. 698, 717 (D. Or. 1997)... 20, 23, 27

*Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052 (5th Cir. 1997) ............................ 27

*Jones v. City of Monroe*, 341 F.3d 474 (6th Cir. 2003) ................................................. 14

*Juvelis v. Snider*, 68 F.3d 648 (3d Cir. 1995) ......................................................... 24, 27

*Klingler v. Director, Dep't of Revenue, Missouri*, 433 F.3d 1078 (8th Cir. 2006)................. 21, 22

*Lentini v. California Ctr. for the Arts, Escondido*, 370 F.3d 837 (9th Cir. 2004) ...................... 26

*Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368 (3d Cir. 1991).......................................... 14

*Nelson v. Thornburgh*, 567 F. Supp. 369 (E.D. Pa. 1983)............................................ 32, 33

*Pa. Protection & Advocacy v. Pa. DPW*, 402 F. 3d 374 (3d Cir. 2005)................................... 31

*Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206 (1998)..................................... 12

*PGA Tour v. Casey Martin*, 532 U.S. 661 (2001)................................................. 12, 13, 24, 25

*Rite Aid of Pennsylvania, Inc. v. United Food and Commercial Workers Union, Local 1776*, 595 F.3d 128 (3d Cir. 2010).................................................................. 4

*Shapiro v. Twp. of Lakewood*, 292 F.3d 356 (3d Cir. 2002).............................................. 7

*Smith v. Johnson & Johnson*, 593 F.3d 280 (3d Cir. 2010)........................................... 4, 33

*Tamara v. El Camino Hosp.*, 964 F. Supp. 2d 1077 (N.D. Cal. 2013) ................................... 26

*Townsend v. Quasim*, 328 F. 3d 511 (9th Cir. 2003)................................................... 32

*United States v. California Mobile Home Park Management Co.*, 29 F.3d 1413 (9th Cir. 1994) 34

*US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002) ................................................. 12, 17

**Statutes**

29 U.S.C. § 794 ...................................................................................... 12, 33

42 U.S.C. § 12101 .............................................................................. 2, 5, 8, 9

42 U.S.C. § 12102 ...................................................................................... 10

42 U.S.C. § 12102(1) ................................................................................... 9

42 U.S.C. § 12134(b) .................................................................................. 11

42 U.S.C. § 12181 ...................................................................................... 5

42 U.S.C. § 12181(7)(C) ............................................................................... 5

42 U.S.C. § 12182(a) .................................................................................. 11

42 U.S.C. § 12182(b)(1)(A)(ii) ............................................................................ 5, 11
42 U.S.C. § 12182(b)(2)(A)(i) ............................................................................ 17, 30
42 U.S.C. § 12182(b)(2)(A)(ii) ............................................................................ passim
42 U.S.C. § 12182(b)(2)(A)(iii) ............................................................................ 24, 30
42 U.S.C. § 12185(b) ............................................................................................ 17
42 U.S.C. §12102(2) ............................................................................................ 10

**Other Authorities**

36 Fed. Reg. 35,544 (Part 36, App. B) (July 26, 1991) ........................................ 19
H. Rep. No. 101-485, pt. 2, at 22-23 (1990) ........................................................ 38

**Rules**

Fed. R. Civ. P. 56 .................................................................................................. 4

**Regulations**

28 C.F.R. § 35.130 ............................................................................................ 11, 19, 21
28 C.F.R. § 36.101 ............................................................................................... 5
28 C.F.R. § 36.301(c) .......................................................................................... passim
28 C.F.R. § 36.302 ............................................................................................. 24, 30
28 C.F.R. § 36.303 ............................................................................................. 30, 31

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs submit the following Memorandum of Law in support of their Motion for Summary Judgment pursuant to Federal Rules of Civil Procedure, Rule 56.

## I.   SUMMARY OF FACTS [1]

Accompanying this memorandum are Plaintiffs' Statement of Undisputed Facts and Exhibits which are incorporated herein.

The Franklin Institute (hereinafter "FI"), a museum located in Philadelphia, Pennsylvania, has a policy to require persons with disabilities who require personal care attendants to pay a double admission fee, for themselves and for their personal care attendants, for both its IMAX Theater and Special Exhibitions. PSUF No. 21.[2]  Plaintiffs and other fact witnesses are persons with disabilities who require assistance with their activities of daily living, including but not limited to toileting, directing wheelchairs, eating, safety, opening doors, drinking water, reading, manual dexterity, and other activities that enable them to participate in the community.  PSUF No. 1 ("My son [Michael Anderson] has very little control over his body. He cannot shift his body position and cannot do any weight changes without his personal attendant's assistance. He has high spasticity that he cannot control. His personal attendants adjust the wheelchair and pull him upright to avoid decubitus ulcers. If he slides too far forward in his wheelchair or leans too far back in his wheelchair, the personal attendants must lift him under his arms so he can sit properly in the wheelchair and can therefore use the wheelchairs'

_____

[1]  References to the "PSUF" are to Plaintiffs' Statement of Undisputed Facts submitted with Plaintiff's Motion for Summary Judgment including the exhibits cited in the PSUF.

[2]  At least since December 2014, FI has also charged a double admission fee for General Admission for some people with disabilities who require a personal care attendant.  PSUF No. 23.

joystick for driving. He requires readjustment in his wheelchair about two times every hour. If his head falls to one-side, the personal attendants must straighten his head."). Personal care attendants (or PCAs) provide the Plaintiffs and other fact witnesses with such assistance and are paid, in the instant action, by the Pennsylvania Medicaid program administered by the Pennsylvania Department of Human Services (previously the Pennsylvania Department of Public Welfare). PSUF No. 4. PCAs attend the FI as paid employees. Unlike friends or family visiting the FI with a person with disabilities, a PCA has no choice whether or not to enter, as his job is to support the person with a disability in the community.

Without their personal care attendants, Plaintiffs and other fact witnesses could not on their own travel to the FI, enter the FI, enter the IMAX Theater and sit throughout an IMAX movie, go to the toilet, safely enter and go to FI Special Exhibits, read exhibition materials, or experience interactive components of the Special Exhibits. PSUF No. 5. In some cases, Plaintiffs have paid personal care attendants seven days a week and 24 hours a day. PSUF No. 2. Others have paid personal attendants during the day who enable them to participate in the community. PSUF Nos. 1-8 ("Without attendants, many of these people with disabilities could be institutionalized in segregated facilities which house only people with disabilities.").

The FI policy requiring persons with disabilities to pay a second admission fee for their personal care attendants is the crux of the Plaintiffs' claim of discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* There is no question that Plaintiffs require the assistance of their personal care attendants to have equal enjoyment of the FI's programs and activities nor any question that the FI charges Plaintiffs a double admission fee for them to enjoy the same FI's benefits as nondisabled patrons. Indeed, the FI asserts its policy is to allow Plaintiffs to enter with their personal care attendants for General Admissions without paying an

additional fee.  PSUF No. 22.  *But see infra* n. 4.  The FI's sole contention is that "[s]imply can't afford" to modify its IMAX and Special Exhibition policy to admit Plaintiffs and their personal care attendants without charging a double admissions fee.  PSUF No. 39.  Yet the FI has not even attempted to collect data to calculate the actual cost if it did not charge for PCAs.  PSUF No. 65.[3]

The uncontroverted evidence shows that the only cost attributable to admitting Plaintiffs with their PCAs is the $1 the FI owes to distributors for fewer than half of the IMAX movies it screens and one of the Special Exhibitions it displayed.  PSUF Nos. 55, 57-60, 66-67.  This $1 loss in potential profit cannot be an undue burden to a $135 million organization under the ADA.

The ADA is a remedial statute that imposes obligations on businesses to change policies, practices and even structurally modify facilities to enable people with disabilities to access the same community and services nondisabled people enjoy.  If such a de minimus cost of $1 in lost profit per PCA admission constituted an undue burden, no business could be required to install ramps, handrails, or wheelchair seating.  Since 1990, the ADA has changed the business landscape to remediate the historic exclusion of people with disabilities from our communities, workplaces, and museums.  The FI's policy to charge people whose disabilities require a PCA to participate in the community for their personal care attendant's admission to the FI's IMAX and Special Exhibitions, effectively excludes them from the museum in violation of the ADA.

---

[3] The FI testified that it had not conducted any analysis of the impact of modifying its policy.  A month later it submitted errata asserting the FI had done an analysis for settlement purposes.  But there is no documentation of such analysis, and no basis to conduct such an analysis as the FI has no information on the number of people with PCAs or even people who use wheelchairs to have entered the FI.  See PSUF No. 36 at n. 8.

## II.   ARGUMENT

### A.   Standard for Summary Judgment

A summary judgment is appropriate when there are no genuine issues of material fact for a jury to decide and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Smith v. Johnson & Johnson*, 593 F.3d 280, 284 (3d Cir. 2010).  Facts are "material" only if they might "affect the outcome of the case under governing law."  *Id.*  In assessing a summary judgment motion, the Court must view the facts in the light most favorable to the nonmoving party.  *Rite Aid of Pennsylvania, Inc. v. United Food and Commercial Workers Union, Local 1776*, 595 F.3d 128, 131 (3d Cir. 2010), *cert. denied,* ___ U.S. ___, 131 S. Ct. 187 (2010).  However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263, 268 (3d Cir. 2008) (emphasis in original) (internal citation omitted).

There are no material questions of fact in this case.  The uncontroverted evidence shows Plaintiffs require the assistance of their PCAs to benefit from and participate in the FI's programs, facilities and services. PSUF Nos. 1-8.  The FI admits its policy is to require people with disabilities who need a PCA to pay a double admission fee to the IMAX Theater and Special Exhibitions.  PSUF No. 21.  The uncontroverted evidence shows the Plaintiffs and fact witnesses have been and continue to be charged an additional General Admissions fee for their PCAs.  PSUF No. 23. *But see infra* n. 4.  Importantly, the record presents no evidence that modifying this policy in any way alters the nature of the FI's mission or programs, let alone constitutes a fundamental alteration. This case comes down to the fact that a $135 million organization is litigating over $1 in lost revenue it pays in per head fees to fewer than half the IMAX film and Special Exhibition distributors.  This de minimus cost cannot be such an extreme

burden to constitute an exception to the ADA's mandate the FI provide equal access to people with disabilities.

### B.  <u>Summary of Legal Argument</u>

Plaintiffs' Motion for Summary Judgment is based on Title III of the Americans with Disabilities Act (ADA),  42 U.S.C. §§ 12181 *et seq.*, and the federal regulations implementing the ADA, 28 C.F.R. §§ 36.101 *et seq.*, which prohibit "public accommodations," including museums, motion picture houses, and theaters, "or other place of exhibition entertainment," from discriminating against people with disabilities.  42 U.S.C. §§ 12181(7)(C)&(H).

Discrimination includes a failure to make modifications to existing practices and policies, 42 U.S.C. § 12101(a)(3)&(5), to enable people with disabilities the equal "opportunity to participate in or benefit from a good, service, [or] facility[.]"  42 U.S.C. § 12182(b)(1)(A)(ii). Further, public accommodations discriminate in violation of the ADA when they "impose a surcharge on a . . .  group of individuals with disabilities to cover the costs of measures, such as the reasonable modifications in policies, practices, or procedures that are required to provide that . . . group with the nondiscriminatory treatment required by the Act or this part."  28 C.F.R. § 36.301(c).  The FI is a public accommodation, PSUF No. 12, and Plaintiffs are otherwise qualified people with disabilities who require assistance in their activities of daily living while attending the FI. PSUF Nos. 8-11.  The FI policy discriminates by charging Plaintiffs an additional admission fee to its General Admission, IMAX Theater, and Special Exhibitions for their personal care attendants to provide such necessary assistance in the museum.[4]  PSUF No. 10.

---

[4]     The FI states it has had a policy that allegedly waives admission fees for personal care attendants for "General Admission." PSUF No. 22. Despite this policy, Plaintiffs have attached undisputed facts documenting numerous incidents where persons with disabilities had to

Without their paid PCAs, the Plaintiffs and other individuals with disabilities who require assistance from paid personal care attendants cannot participate in or benefit from many of the museum's services, including its IMAX Theater movies and Special Exhibitions. PSUF Nos. 1-8. Under the ADA, Plaintiffs and other individuals with disabilities must pay admission fees for themselves, the same as nondisabled persons who wish to visit the museum.  PSUF Nos. 17-19. Plaintiffs do not contend that requiring a person with a disability to pay the same admission fee as a nondisabled patron is a violation of the ADA.

The instant litigation focuses on Defendant's admitted policy or practice that people with disabilities must pay an additional and separate admission fee for their personal care attendants who are required for Plaintiffs to access the FI's facilities and to participate in many of its activities. PSUF Nos. 5 & 8.  Plaintiffs argue that this double fee violates the ADA and is the legal issue before this Court.

To require persons with disabilities who require assistance from PCAs to pay an additional fee violates the ADA and discriminates against persons with disabilities by imposing the surcharge of a double fee for the admission of the PCA.  See 28 C.F.R. § 36.301(c) ("A public accommodation may not impose a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures, such as . . . reasonable

---

pay a General Admission fee for their personal care attendants, as well as for themselves.  PSUF No. 23 ("The Franklin Institute told me that it was not its policy to permit personal care attendants to be admitted without paying and therefore a 'single membership' would not permit a person with disabilities who paid the General Admission to enter with a personal care attendant without paying an additional admissions fee for the personal care attendant.").  This instant action therefore challenges FI's continued *practice* of charging an additional General Admission fee for individuals with disabilities to enter the museum with their PCAs, as well as its stated policy of charging an admission fee for PCAs to enter the IMAX and Special Exhibitions with persons with disabilities.

6

modifications in policies, practices, or procedures, that are required to provide that individual or group with the nondiscriminatory treatment required by the Act or this part."). [5]

Defendant asserts the affirmative defense that waiving admission fees for PCAs is a "fundamental alteration" of its program and/or would cause an "undue burden." [6]  First, the FI's own testimony is that admitting Plaintiffs with their PCAs without requiring Plaintiffs to pay a double fee would not impact the FI's mission.  PSUF No. 14.  Second, the ADA does not provide an undue burden defense to a public accommodation's failure to modify its policies to afford equal access to persons with disabilities.  42 U.S.C. § 12182(b)(2)(A)(ii).

Assuming *arguendo*, the undue burden defense applies, the FI has testified that it does not incur any additional expense attributable to admitting PCAs for more than half of all IMAX movies and for *all but one* of the Special Exhibitions shown between January 2012 and January 2015.  PSUF Nos. 55, 57-60, 65-67 (showing the FI paid a flat fee for 10 of the 18 IMAX movies).  The only cost attributable to admitting PCAs is a fee paid to some distributors in the amount of 85[C] to $1.25 per head for IMAX movies and $1 for one of the Special Exhibitions. PSUF Nos. 60 & 67.  Moreover, this cost is merely a loss in potential profit, because the FI properly charges the person with a disability $6 for an IMAX Theater ticket, which more than covers the FI's costs for the person with a disability and her personal care attendant.  Indeed, if the FI did modify its policy in compliance with the ADA, it would continue to make a $3.50 profit on each person people with a disability who attended the IMAX with her PCAs.  PSUF Nos. 17, 60, 64.  Plaintiffs contend that what is really involved is not Defendant's objection to

---

[5] Plaintiffs have the burden of proof on this issue.  *Shapiro v. Twp. of Lakewood*, 292 F.3d 356, 361 (3d Cir. 2002).

[6] Defendant has the burden of proof on this issue.  *Id.*

the waiver of financial "costs" but the FI's desire to "profit" financially from the double admission fees that persons with disabilities pay for their PCAs.  PSUF Nos. 64 & 68.

Finally, the FI does not lose any profits because, as the FI explained, PCAs can sit in a folding chair and do not need to occupy a fixed seat.  PSUF No. 74.  In fact, in the past three years, the FI has only ever sold out of 9 IMAX Theater shows, and each of those times more than the number of fixed seats were sold.  PSUF No. 82.  Nonetheless, the FI asserts it will charge Plaintiffs a double fee to enter with their PCAs even when the theater is half empty, as it is the overwhelming majority of the time.  PSUF No. 84-85, 88.

The ADA requires public accommodations, like the FI, to incur such de minimus costs to end discrimination against people with disabilities.  42 U.S.C. § 12101(a)(3).  The incremental costs are so de minimus that the FI has never attempted to count the number of PCAs who enter to measure the impact of changing its policy and has not produced any evidence showing the number of PCAs or even the number of people using wheelchairs who have entered the FI.  PSUF Nos. 45 & 71.  Moreover, the FI gives away free IMAX and Special Exhibitions tickets and does not even know how many free tickets it has given away.  PSUF Nos. 47-53, 69.  If the cost of admitting Plaintiffs is in fact significant, the FI would track the number of tickets it routinely gives away.  PSUF No. 53.  Finally, the FI in fact will still profit if it waives the fees for PCAs, albeit less than it would otherwise. *Compare* PSUF No. 67 (showing FI charged an additional $11 to visit the "Pompeii" Special Exhibition) *with* PSUF No. 66 (showing "Pompeii" was the only Special Exhibition the FI paid a per-head licensing fee, which was in the amount of $1 per person). Indeed, other museums and cultural institutions Plaintiffs and other fact witnesses attend, and comparable museums around the country, do not charge people with disabilities an additional fee to enter with their personal care attendants.  PSUF Nos. 89-91.

8

Accordingly, Defendant has not produced any evidence on the record that modification of its policy would constitute a fundamental alteration or undue burden.  Since Plaintiffs require PCAs to access and experience the FI, the FI's policy and practice to impose a double admission fee for them to enjoy the same experience as nondisabled patrons discriminates against Plaintiffs in violation of the ADA.

### C. <u>Plaintiffs' Legal Argument</u>

Congress enacted the Americans with Disabilities Act (hereinafter "ADA"), 42 U.S.C. § 12101 *et seq.*, in 1990, finding that

> discrimination against individuals with disabilities persists in such critical areas as … public accommodations … [and] individuals with disabilities continually encounter various forms of discrimination, including … failure to make modifications to existing … practices….

42 U.S.C. § 12101(a)(3)&(5).  These Congressional Findings apply to the instant case, an action under Title III of the ADA, "Public Accommodations and Services Operated by Private Entities." 42 U.S.C. §§ 12181-89.  A public accommodation is a "a museum, library, gallery, or other place of public display or collection" and "a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment" that affects commerce.  42 U.S.C. § 12181(7)(C)&(H).  Defendant FI is a "museum" and operates a motion picture house or theater.  PSUF No. 12.  The FI impacts commerce by generating more than $32 million in revenues in 2013.  PSUF No. 32.  The FI is therefore subject to Title III's public accommodation mandates.

Plaintiffs and other fact witnesses are individuals who have a "physical or mental impairment that substantially limits one or more major life activities of such individual."  42 U.S.C. § 12102(1).  Plaintiffs' major life activities that are limited include, "caring for one self, performing manual tasks, . . . eating, . . .  walking, standing, lifting, bending, speaking, . . .

learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. §12102(2); PSUF Nos. 1-8 ("('I provide [Michael Anderson] assistance with all his activities of daily living, including toileting, bathing, eating, dressing, transferring from and to his bed, manual dexterity. . . . In addition, I assist him with his wheelchair when he is fatigued and/or when he must maneuver and steer his wheelchair in tight locations.') . . . ('Gina is a 50 year old woman who has severe intellectual disability, Seckel syndrome, is unable to speak, frequently loses her balance, has brittle diabetes, and is a primordial dwarf. . . . Gina takes insulin five times a day. She often chokes and therefore requires that her food be cut into very small pieces. She requires assistance with many activities of daily living, including assistance in toileting and with stairs. She needs total assistance for her diabetes' monitoring, oversight, and administration.')"). Accordingly, Plaintiffs and other fact witnesses are individuals with disabilities protected under the ADA. 42 U.S.C. § 12102.

Plaintiffs and other fact witnesses are otherwise qualified to attend the FI as they are able to participate in the FI's programs and services with the assistance of their personal care attendants. PSUF No. 11. Indeed, with the assistance in daily living many individual Plaintiffs and fact witnesses live independently, have completed associates' and bachelors' degrees, and work and/or volunteer at part time jobs. PSUF No. 11.

Plaintiffs and other fact witnesses require substantial assistance with these major life activities. PSUF Nos. 1-8. In very large part, they receive such assistance from paid personal care attendants who are provided to Plaintiffs via the Pennsylvania Medicaid program. PSUF No. 4. Plaintiffs and the fact witnesses require these personal care attendants to perform these major life activities. PSUF Nos. 1-5. For some of the Plaintiffs and fact witnesses, their personal care attendants are with them seven days a week and 24 hours a day, for others their

personal care attendants are with them when they are out in the community. PSUF No. 2. Plaintiffs require the services of their personal care attendants to receive the equal enjoyment and benefits that nondisabled people take for granted. PSUF Nos. 1-8. Without their personal care attendants, Plaintiffs could not access or benefit from Defendant's museum, theaters or exhibits. PSUF No. 5. Defendant's policy requires Plaintiffs to pay an additional admission fee for their PCAs. PSUF No. 21.

### 1. Defendant FI Discriminates against Plaintiffs with Disabilities by Denying them the Opportunity to Participate and Benefit Equal to Nondisabled

Congress prohibits discrimination by public accommodations, including "[n]o individual shall be discriminated against on the basis of disability in the *full and equal enjoyment* of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation . . . ." 42 U.S.C. § 12182(a) (emphasis added). Specifically, Congress enacted that "[i]t shall be discriminatory to afford an individual or class of individuals on the basis of a disability or disabilities … with the *opportunity to participate in or benefit* from a good, service, facility, privilege, advantage or accommodation *that is not equal to that afforded to other individuals*." 42 U.S.C. § 12182(b)(1)(A)(ii) (emphases added).[7]

The Supreme Court explained, "an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers." *Alexander v Choate*, 469 U.S. 287, 301 (1985) (applying the predecessor of the ADA, Section 504 of the Rehabilitation

---

[7]    Federal regulations implementing both Titles II and III of the ADA require similar equality of treatment. *Compare* 28 C.F.R. § 35.130 (Title II) *with* 28 C.F.R. 36.201 (Title III). Therefore, the Title II *Yeskey*, *infra* analysis applies to Title III. In enacting the ADA, Congress statutorily required that the ADA's regulations comport with Section 504 of the Rehabilitation Act of 1973, 42 U.S.C. § 12134(b). *See Addiction Specialists, Inc. v. The Township of Hampton and the Commonwealth of Pennsylvania,* 411 F.3d 399, 405 n. 4 (3d Cir. 2005) (identifying language in both the ADA and Section 504 "intend to" extend relief beyond qualified individuals with disabilities); *Fredrick L. v. DPW*, 364 F.3d 487, 491 (3d Cir. 2004).

Act, 29 U.S.C. § 794); *see also Helen L. v. DiDario*, 46 F.3d 325, 332 (3d Cir. 1995) (applying this analysis to the ADA).  The Court explained that the Rehabilitation Act was enacted to remedy "[d]iscrimination against the handicapped [that] was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference -- of benign neglect." *Id.* at 295.  Most importantly, since "the handicapped typically are not similarly situated to the nonhandicapped," a policy may still discriminate even though it is "neutral on its face." *Id.* at 301-302.  Accordingly, equal opportunity to participate may require different treatment for disabled persons than for nondisabled persons to achieve equal access for individuals who have disabilities.  *US Airways, Inc. v. Barnett*, 535 U.S. 391, 429 (2002).

Under the ADA the Supreme Court held:

> preferences will sometimes prove necessary to achieve the Act's basic equal opportunity goal.  The Act requires preferences in the form of 'reasonable accommodations' that are needed for those with disabilities to obtain the *same ...* opportunities that those without disabilities automatically enjoy.  By definition any special 'accommodation' requires [a defendant] to treat [an individual] with a disability differently, i.e., preferentially.  And the fact that the difference in treatment violates a … disability-neutral rule cannot by itself place the accommodation beyond the Act's potential reach.

*Id.* (emphasis in original).

The initial step is to ascertain whether the person with a disability requires a reasonable accommodation to achieve equal access.  *See, e.g.*, *PGA Tour v. Casey Martin,* 532 U.S. 661 (2001) (equal "*access*" to compete was required use of a golf cart in the PGA tour); *cf. Pennsylvania Dept. of Corrections v. Yeskey,* 524 U.S. 206 (1998) (holding prison "benefits" included recreational "activities," medical "services," and educational "programs" including the prison library).  The requirement for a modification is triggered only when it is "necessary to afford" disabled persons access to, participation in, and equal opportunity to benefit from the public accommodation's services, programs, and activities.  42 U.S.C. § 12182(b)(2)(A)(ii).

Plaintiffs understand that the ADA does not require either a "general duty" or any requirement for "all" modification requests. The only requests for modifications that the ADA requires are those that are both "reasonable" and "necessary" to achieve equality.  The legal issue with regards to this mandate is whether or not eliminating the double admission fee is reasonable and necessary for persons with disabilities who require personal care attendants to achieve equal opportunity from the FI.

In *PGA Tour*, the Supreme Court considered whether the PGA was required to allow a player with disabilities to use a golf cart while competing in the tournament.  *PGA Tour*, 532 U.S at 668.  The plaintiff had a degenerative disorder that affected his right leg and prevented him from being able to walk an 18-hole golf course without the use of a golf cart.  *Id.* at 668 & 682 ("Martin's claim thus differs from one that might be asserted by players with less serious afflictions that make walking the course uncomfortable or difficult, but not beyond their capacity.").  While the nondisabled golfers would only have to endure the psychological stress of the competition and fatigue, the plaintiff would have to endure all of this plus the stress of physical pain and risk of injury.  *Id.* at 672. The golf cart allowed the plaintiff to receive a comparable experience by removing the additional fatigue and stress that would have been added because of his disability.  *Id.* at 688-690 (holding the accommodation was necessary "to allow Martin the chance to qualify for and compete in the athletic events petitioner offers to those members of the public who have the skill and desire to enter").  The Court held the golf cart was a reasonable modification to grant equal access to individuals with disabilities to the PGA's programs and services, because "[t]hat is exactly what the ADA requires." *Id.* at 690.

The Third Circuit considered whether the Rehabilitation Act required a medical school to provide special exam seating to enable an otherwise qualified medical student to sit for exams.

13

*Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1385 (3d Cir. 1991).  Judge Scirica explained, "if MCP's failure to provide a suitable seating arrangement makes its program effectively unavailable to a student with a back injury, then that failure could constitute the type of 'benign neglect' referred to in *Alexander* and a violation of the Rehabilitation Act."  *Id.* (referring to *Alexander*, 469 U.S. at 300).

The D.C. Circuit explained that a modification is necessary to provide equal access for a person with a disability when the modification is necessary to access the same program benefit as nondisabled person. *Am. Council of the Blind v. Paulson*, 173-74, 525 F.3d 1256, 1267-68 (D.C. Cir. 2008) (holding that the United States Treasury's paper currency design denied visually impaired persons meaningful access to U.S. currency);  *see also Jones v. City of Monroe*, 341 F.3d 474, 478-79 (6th Cir. 2003) (finding the application of a 1-hour parking limit did not deny equal access to a wheelchair user because "meaningful access to downtown parking [does not mean] meaningful access  to an individual's destination of choice"); *Alumni Cruises, LLC v. Carnival Corp.*, 987 F. Supp. 2d 1290, 1313 (S.D. Fla. 2013) (finding it necessary "for people with developmental disabilities such as autism to avoid loud music and strobe lights in order to be able to enjoy a dancing venue, [and] in order to fulfill the ADA's promise to provide those with qualifying disabilities 'full and equal enjoyment' of public accommodations, Carnival must make available to clients [with autism] a dancing venue that does not have these features").

Here Plaintiffs seek the same "opportunity to participate in" the FI's IMAX Theater and Special Exhibitions as nondisabled persons. PSUF No. 10.  In order to have "full and equal enjoyment" Plaintiffs require personal care attendants with them when they go to the FI, its IMAX Theater and a Special Exhibitions.  PSUF No. 8. Without their personal care attendants, they cannot access and use the IMAX Theater or the Special Exhibitions because, *inter alia,*

without their personal care attendants they cannot move throughout the Special Exhibitions, sit upright in the IMAX, drink water or go to the bathroom throughout the duration of their visit. PSUF No. 8 ("Michael [Anderson] 'does not have the manual dexterity to enter the IMAX Theater without his personal care attendant opening and closing the door for him.  He does not have the ability to take a sip of water from his water bottle without the help of his personal care attendant. There are no Franklin Institute personnel who have provided that assistance.' Tachau Decl. at ¶23.").  They want the "opportunity to participate in or benefit from" exploring the Special Exhibitions, as well as to read and understand the many descriptions, and to participate in the other activities which make the museum's Special Exhibitions interesting.  PSUF Nos. 4-8, 15.

The undisputed facts in the instant action establish that Plaintiffs require their PCAs to have the *same* opportunity as nondisabled persons to fully and equally participate in and benefit from the museum's facilities and services.  PSUF Nos. 4-7, 15.  While nondisabled persons can enjoy the FI without worrying about walking, manually manipulating interactive exhibits, reading the signs in the exhibits, toileting needs, readjusting their position in wheelchairs, safety, eating, and drinking, Plaintiffs need personal care attendants to do the same.  PSUF Nos. 1-8.  Without their personal care attendants, Plaintiffs are not able to move about the FI, care for themselves, interact with or sometimes understand the exhibitions or programs.  PSUF Nos. 1-87.  The FI's refusal to modify its admission fee policy for persons with disabilities who require personal care attendants denies Plaintiffs the equal opportunity to attend and participate in its programs and services as nondisabled patrons.

Throughout the litigation, Defendant FI has repeatedly argued that it does not deny Plaintiffs the "opportunity to participate in or benefit" from the IMAX and Special Exhibitions

because it merely requires Plaintiffs to pay the an admission fee for their personal care attendants that everyone else is required to pay, whether disabled or nondisabled.

Defendant's narrow focus on the double admission fee as the "opportunity to participate in or benefit" is erroneous for at least two reasons.

First, the goods, services and privileges go far beyond mere admission to the IMAX Theater or the museum's Special Exhibitions.  People without disabilities, who do not require assistance from personal care attendants, visit the museum to enjoy the exhibits, activities, programs, IMAX movies and Special Exhibitions, after they pay the admission fee only for themselves – a single admission fee, not a double fee.  PSUF Nos. 16-18. As discussed *supra*, Plaintiffs require their PCAs to have the same participation and benefit from the FI's IMAX and Special Exhibitions.  PSUF Nos. 1, 5-8.  Without paying a double admission fee, Plaintiffs are effectively denied admission.  PSFU Nos. 8-10 ("Landsman Decl. at ¶ 22 ('Mitchell [Landsman] and his attendant did not visit the Body Worlds Special Exhibition because it was too expensive for two tickets and he could not afford to pay for his personal care attendant.'); Tachau Dep. at 22:15-24 (Michael Anderson 'can't attend the Franklin Institute' because '[h]e doesn't have the money to pay for his attendant and he cannot go by himself.')").  Defendant's position is like arguing that a wheelchair user is free to enter the museum without her wheelchair.  Clearly without the aid of this essential adaptive equipment the patron could not move about, experience, and benefit from the museum's services.  The same is true of Plaintiffs deprived of their PCAs.  PSUF No. 8.  The FI's double admission fee to the museum, including the IMAX Theater and Special Exhibitions, are the conditions precedents without which people cannot enter or participate in those forums.  PSFU No. 10, 21-25, 31, 85.  Nondisabled persons enter *and participate* after paying only for themselves. PSUF Nos, 16-18; *see also* PSUF No. 27

16

(explaining the FI "does not charge an additional fee for a patron who seeks admission with a wheelchair or a service animal.  Collins Dep. at 188:3-10").

Second, Defendant's position fails to recognize that a policy may still discriminate even if it is "neutral on its face" because "the handicapped typically are not similarly situated to the nonhandicapped."  *Alexander*, 469 U.S. at 301-302.  Indeed, the ADA mandates public accommodations provide reasonable modifications to enable "those with disabilities to obtain the *same* . . . opportunities that those without disabilities automatically enjoy." *Barnett*, 535 U.S. at 429 ("[P]references will sometimes prove necessary to achieve the Act's basic equal opportunity goal.").

Without their personal care attendants, Plaintiffs cannot access the goods or services at the FI.  Thus, to treat Plaintiffs the same as nondisabled persons, by requiring they pay a separate admission fee for their personal attendants, disregards how the Plaintiffs are different from nondisabled patrons and denies the Plaintiffs meaningful access to the FI's benefits.  Without their PCAs Plaintiffs are effectively excluded from the FI.  PSUF No. 10.

## 2. Defendant Discriminates in Refusing to Modify Its Policy To Achieve Equal Opportunity to Enjoy the Museum's Activities and Programs

Discrimination under the ADA includes

> the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods… or accommodations, unless such criteria can be show to be necessary for the provision of the goods … or accommodations being offered.

42 U.S.C. § 12182(b)(2)(A)(i).

Congress delegated Title III ADA rulemaking to the U.S. Department of Justice (DOJ), and the DOJ promulgated its Title III "public accommodation" regulations at 28 C.F.R. Part 36. 42 U.S.C. § 12185(b).  The regulations track the statute and prohibit "eligibility criteria that

screen out or tend to screen out" persons who require personal attendant care services to "fully and equally" enjoy the benefits and programs of a public accommodation.  28 CFR § 36.301(a).

> The "General" subpart prohibits a public accommodation from imposing or applying
>
> > eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods … or accommodations, unless such criteria can be show to be necessary for the provision of the goods … or accommodations being offered.

*Id.*  The DOJ commentary points out that Section 36.301 "prohibits policies that unnecessarily imposes *requirements* or *burdens* on individuals that are not placed on others."  28 C.F.R. Part 36, App. C to 36.301 (emphases added).  The DOJ commentary also notes that

> § 36.301 prohibits the imposition of criteria that "*tend to*" screen out an individual with a disability. This concept, which is derived from current regulations under Section 504 (see, *e.g.*, 45 CFR 84.13), makes it discriminatory to impose policies or criteria that, while not creating a direct bar to individuals with disabilities*, indirectly prevent or limit their ability to participate.* For example, requiring presentation of a driver's license as the sole means of identification for purposes of paying by check would violate this section in situations where, for example, individuals with severe vision impairments or developmental disabilities or epilepsy are ineligible to receive a driver's license and the use of an alternative means of identification, such as another photo I.D. or credit card, is feasible.

*Id.* (emphases added).

People with disabilities who require personal attendants for their activities of daily living are the only individuals for whom the FI requires a double admission fee – one for the person with the disability and one fee for the personal attendant who is necessary to accompany and assist the person with the disability.  PSUF Nos. 21-31.  The FI does not impose an additional fee for a blind person to enter with a guide dog, or a wheelchair user to enter with their mobility equipment.   PSUF No. 27.  The personal care attendants' services are no different for Plaintiffs.  A personal care attendant is a paid employee who goes to FI solely to provide assistance so that

the person with a disability will benefit equally as a nondisabled person as is required by her job. PSUF No. 7.  Just as these individuals with disabilities cannot "fully and equally enjoy" the FI's services and facilities without their guide dog and wheelchair, Plaintiffs cannot "fully and equally enjoy" the FI without their personal care attendant.  PSUF No. 8.  The added expense of paying for these services as additional admission charges is an eligibility criteria that tends to screen out such individuals from using the museum.  PSUF No. 10.[8]

> The federal regulations more specifically prohibit public accommodations from
>
>> impos[ing] a *surcharge* on a … group of individuals with disabilities to cover the costs of measures, such as the provision of auxiliary aids, barrier removal, alternatives to barrier removal, and *reasonable modifications in policies*, practices, or procedures, that are required to provide that … group with the nondiscriminatory treatment required by the Act or this part.

28 CFR § 36.301(c) (emphases added), *see also* 28 C.F.R. § 35.130(f)(1998)  (imposing the same prohibition under Title II of the ADA).  While the general prohibition excludes eligibility criteria that are "necessary for the provision of the goods . . . or accommodations being offered," the surcharges are blanket prohibitions.  The only exceptions are "temporary" deposits where the DOJ's commentary in 1991 stated "[i]t is the Department's view that reasonable, *completely refundable*, deposits are not to be considered surcharges prohibited by this section."  36 Fed. Reg. 35,544 (Part 36, App. B) (July 26, 1991) (emphasis added).

Several courts have interpreted this regulation.  The most closely analogous case involved a multi-purpose indoor arena in Portland, Oregon that charged wheelchair users a

---

[8] "Landsman Decl. at ¶ 22 ('Mitchell [Landsman] and his attendant did not visit the Body Worlds Special Exhibition because it was too expensive for two tickets and he could not afford to pay for his personal care attendant.'); Tachau Dep. at 22:15-24 (Michael Anderson 'can't attend the Franklin Institute' because '[h]e doesn't have the money to pay for his attendant and he cannot go by himself.  And the Franklin Institute told us they would not provide him with the care he needs when he goes.')."  PSUF No. 10.

higher ticket price because wheelchair spaces occupied more space than conventional seats. *Independent Living Resources v. Oregon Arena Corp.*, 982 F. Supp. 698, 717 (D. Or. 1997).  The District Court of Oregon held that, under 28 C.F.R. § 36.301(c), the defendant arena operator was precluded from charging wheelchair users a higher fee than it charged nondisabled patrons. *Id.* at 786.  The Court rejected the defendant's argument that wheelchair users were being charged the same amount as nondisabled patrons proportionate with the additional space that their wheelchairs consumed.  *Id.* at 717.  The court explained that a public accommodation, such as the arena, may not impose a surcharge on persons with disabilities to cover the cost of compliance with the ADA.  *Id.* at 717-18.

Similarly, Carnival Cruises violated the ADA by charging youth with autism an additional $100 fee to provide an accessible dance club space on its cruise ship.  *Alumni Cruises, LLC v. Carnival Corp.*, 987 F. Supp. 2d 1290, 1313 (S.D. Fla. 2013) (finding the teens and adults with autism were not able to use the night club or teen club because the music was too loud and the strobe lights induced seizures).  While Carnival made separate club space available to the teenagers with autism to provide comparable dancing events, "[b]ecause Carnival implicitly concedes that a private dance party is necessary to allow people with developmental disabilities such as autism to enjoy the same dance parties that people without disabilities do, Carnival may not charge … for providing it with the opportunity for its clients to enjoy comparable dance parties." *Id.* at 1313 (citing 28 C.F.R. § 36.301(c)); *see also Davison v. Hart Broadway, LLC*, No. S-07-1894 LKK/CMK, 2009 U.S. Dist. LEXIS 48572 at *1 at 26 (E.D. Cal. May 26, 2009) (finding that the disabled guests who were charged for access to an elevator did not have "full and equal" access to the facilities as non-disabled guests, as they only had three hours to enter

and exit the facilities free of charge whereas non-disabled patrons could come and go at no cost, using the stairs).

While only a few cases have considered the application of Title III's surcharge prohibition under 28 C.F.R. § 36.301(c), several circuit courts have applied the identical prohibition under Title II:  "A public entity may not place a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures, such as … program accessibility, that are required to provide that individual with the nondiscriminatory treatment required by the Act or this part."  28 C.F.R. § 35.130(f) (1998).

In *Dare v. California, Dep't of Motor Vehicles*, 191 F.3d 1167 (9th Cir. 1999), *cert. denied*, 531 U.S. 1190 (2001), the Ninth Circuit applied the Title II  prohibition on surcharges. "The ADA requires special parking arrangements such as handicapped parking spaces.  These spaces allow disabled people *equal access* to public buildings in which California provides services, programs and activities."  *Id.* at 1172 (emphasis added). The Court held that "Title II protects the rights of disabled people to have the same public services, programs, and activities as those who are not disabled. See 42 U.S.C. § 12132. If public entities place a surcharge on measures that help disabled people achieve this parity, disabled people then are paying fees others do not and *so are not being treated equally*."  *Id.* at 1176 (emphasis added).

Similarly, in *Klingler v. Director, Dep't of Revenue, Missouri*, the Eighth Circuit found fees for parking placards discriminated against persons with disabilities.  433 F.3d 1078, 1080 (8th Cir. 2006). Despite the fact that the ADA did not "specifically require states to offer removable parking placards to disabled individuals . . . .," the Circuit recognized that Missouri cannot "impose fees for the placards on the basis that the placard system itself is not 'required' by the ADA. . . ."  *Id.* at 1080-81.  "[A]s we have noted, the ADA purposely offers public

entities flexibility in meeting the Act's standard for program access.  This flexibility, however, cannot be used to render meaningless the surcharge prohibition in § 35.130(f)."  *Id.*

The same logic applies here.  The parking placards are a necessary accommodation that provide disabled individuals with access to a public accommodation, just as the personal care attendants in the instant case are a necessary accommodation to provide Plaintiffs with access into the FI's IMAX and Special Exhibitions.  PSUF No. 10.  As such, the imposition of double admission fees for the Plaintiffs in this case is analogous to charging disabled individuals for disability parking placards.  While there is no question people with disabilities could park car without a placard, the reason for the placard is to achieve equality.  Without the placard, people with disabilities may have to return frequently to a parking spot to put money in machine and may not be able to do as readily as nondisabled persons.  The additional administrative cost of issuing handicapped parking placards cannot be passed on to people with disabilities to afford them equal access.

Here, the FI has not produced any evidence regarding (or even calculated) the cost of admitting PC**As,** yet insists it must pass on such costs to people with disabilities who require PCAs to achieve equal access.  PSUF Nos. 55, 65.  The ADA is a remedial statute, and imposes costs to address the "benign neglect" that has excluded generations of people with disabilities from our communities, workplaces, and museums.  Even where there are some costs, the ADA requires public accommodations to incur costs.  The defendant *Alumni Cruises* was required to absorb the significant expense to construct and provide an entirely separate nightclub facility, and could not pass along that cost to patrons with disabilities. 987 F. Supp. 2d at 1313.  The ADA clearly prohibits imposing additional costs on patrons with disabilities to have a comparable experience.  *Id.* at 1314; *cf* PSUF Nos. 89-91 (listing a number of museums and

22

cultural institutions that do not charge people with disabilities an additional fee to enter with their PCAs).  Most analogous is the opinion in *Independent Living Resources v. Oregon Arena Corp.*, 982 F. Supp. 698, 717 (D. Or. 1997).  The District of Oregon explained that even though a disabled patron's wheelchair took up more room than a nondisabled seat, depriving the venue of potential revenue, the ADA prohibits charging an additional fee to provide an equal experience to people with disabilities.  *Id.*

Even if the FI might lose potential revenue by modifying its policy, it cannot charge people with disabilities more to access equal enjoyment of its goods and services.  As explained above, excluding PCAs effectively excludes Plaintiffs.  PSUF No. 10.  Accordingly, the FI must admit Plaintiffs' PCAs to provide equal enjoyment.  Charging Plaintiffs a double admission fee for the same experience enjoyed by nondisabled people is discriminatory and violates the ADA. 28 C.F.R. § 36.301(c).

These cases make very clear that a public accommodation cannot charge a surcharge to a person with a disability who requires a personal care attendant to enter and enjoy the FI's IMAX Theater and Special Exhibitions.  In the present case, it is beyond dispute that without their personal care attendants Plaintiffs and other people who require PCAs cannot "fully and equally enjoy" the IMAX or Special Exhibitions.  PSUF No. 7.  It is also clear that requiring the persons with disabilities to pay a double admission fee "screens out or [at the least] tends to screen out" persons with disabilities from attending the FI's IMAX and Special Exhibitions.  PSUF No. 10. The double admission fee for both the person with a disability and that person's personal care attendant is a surcharge and is disability discrimination under Title III of the ADA.  PSUF Nos. 5, 10, 21.

**3.  Waiving Double Admission Fees Is Not a Fundamental Alteration of the FI's Mission or Program and FI's Refusal to Modify Its Policy Violates the ADA**

Discrimination under ADA Title III includes

> a failure to make reasonable modifications in policies … when such modifications are necessary to afford such goods … or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods … or accommodations.  42 U.S.C. § 12182(b)(2)(A)(ii). [9]

In promulgating the federal regulations, the DOJ tracked the statutory language, stating the requirement in the affirmative: "A public accommodation shall make reasonable modifications. . . ."  28 CFR § 36.302(a).

Even where a modification is necessary to afford equal access to people with disabilities, such modification is not required if it would fundamentally alter the nature of the goods or services provided.  Whether a reasonable modification fundamentally alters the nature of the goods or services provided is an affirmative defense and is a fact-based inquiry.  *PGA Tour*, 532 U.S. at 668; *Juvelis v. Snider*, 68 F.3d 648, 653 (3d Cir. 1995).  A modification may pose a fundamental alteration if it seeks "to obtain a substantively different benefit than is already provided."  *Paulson*, 252 F.3d at 1267-68 (holding altering the currency was not a fundamental alteration because it did not expand the benefit sought from using currency, just as eliminating stairs in public transit does not expand the function of a public transit system).

In *PGA Tour*, the Supreme Court analyzed whether permitting Mr. Martin to use a golf cart in the tournament would fundamentally alter the nature of the game of golf.  532 U.S. at 690.  While recognizing the differences between walking throughout the tournament and using a cart

---

[9]  Notably, Congress did not include an "undue burden" defense in Title III as part of reasonable modifications discrimination, even though it did include it in the "segregated or otherwise treated differently" discrimination.  42 U.S.C. § 12182(b)(2)(A)(iii). See Section 4 *infra.*

and the impact of walking on fatigue, nevertheless the Court held that riding in a cart would not change the "fundamental nature" of the game of golf nor of the tournament.  *Id.* at 682-84.  The Court explained that a fundamental alteration would exist if the accommodation altered an essential aspect or the nature of the golf game or if it gave a disabled player an advantage over others (and thus fundamentally altering the character of the competition).  *Id.* at 664.

The Ninth Circuit considered the fundamental alteration defense in regards to movie theater seating in *Fortyune v. American Multi–Cinema, Inc.*, 364 F.3d 1075, 1085 (9th Cir. 2004) (holding a theater was required to provide wheelchair seating for a disabled individual as well as a seat for his wife).  The plaintiff used a wheelchair and was unable to attend the movies without either his wife or an attendant due to the nature of his disabilities.  *Id.* at 1081.  The theater had a wheelchair companion seat but it was often occupied by nondisabled people when the plaintiff tried to attend the movie.  *Id.*  While the extra seat was not necessary for the wheelchair-user to enter the movie, it was necessary for him to view and *enjoy* the movie as he could only enjoy sitting through the movie with a companion.  *Id.*  The court reasoned that because the plaintiff required a companion to enjoy the viewing, it was "necessary" for his companion to be seated next to him.  *Id.* at 1083.  As such, the court mandated the defendant theater to enforce a policy that ensured companion seating be available to wheelchair-user patrons because it was necessary and not a fundamental alteration.  *Id.* at 1084.

These are the kinds of modifications to policies and buildings that the ADA has required to enable people with disabilities to access our public buildings, services, schools, and workplaces to become members of the community.  42 U.S.C. § 12182(b)(2)(A)(ii).  Without the ADA's mandates to provide ramps, elevators, access to guide dogs, accessible seating, and

modification to polices, people with disabilities could not enjoy equal access to the goods and services nondisabled people take for granted.

The ADA mandated that the theater *Fortyune* not only allow the plaintiff enter the movie theater, but enjoy the movie seated next to his wife, as nondisabled couples do every day.  364 F.3d at 1084.   In this case, Plaintiffs seek to attend the FI's IMAX Theater and Special Exhibitions independently to enjoy the movie themselves.  PSUF No. 5.  In order to do that, they need the assistance of their PCAs. PSUF No. 5, 8.  Unlike the wife in *Fortyune*, Plaintiffs' PCAs are not there to enjoy the movie as a companion or friend.  They are required by their job duties to go to the FI. They have no choice whether or not to go.  PSUF No. 7.

In *Lentini v. California Ctr. for the Arts, Escondido*, a quadriplegic patron in a wheelchair sued a concert venue for denying her admission with a service animal.  370 F.3d 837 (9th Cir. 2004) (holding the modification to the concert hall's policies, to allow a service animal, did not fundamentally alter the service provided by the concert hall).   The service animal provided protection and assistance with retrieving dropped items.  *Id.* at 839.  The Ninth Circuit established that whether an accommodation fundamentally alters a service is an affirmative defense and an intensively fact-based inquiry.  *Id.* at 845.  While the defendant argued that a barking dog would fundamentally alter the service of the concert hall by distracting and potentially driving away patrons, the court held that the dog's presence was not a fundamental alteration as the dog barked only twice, it was not a significant disturbance, and nobody ever complained about the dog or barking.  *Id.* at 846.  Accordingly, allowing the dog did not fundamentally alter the concert services provided by the defendant.  *Id.*, *see also Tamara v. El Camino Hosp.*, 964 F. Supp. 2d 1077 (N.D. Cal. 2013) (finding a hospital failed to establish that allowing a service dog, which helped the plaintiff with such things as balancing, taking off her

jacket, and helping with small tasks, would fundamentally alter the nature of the facility); *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052 (5th Cir. 1997) (holding that plaintiff's request to use his guide dog on the defendant's public brewery tour was a reasonable request and defendant failed to show this would fundamentally alter the nature of the services or jeopardize the safety of the services).

The Third Circuit analyzed the fundamental alteration defense and held that modifying a residency requirement to be eligible for public services was not a fundamental alteration. *Juvelis v. Snider,* 68 F.3d 648, 652 (3d Cir. 1995) (applying Section 504 of the Rehabilitation Act). To be eligible for Medical Assistance, Pennsylvania's Department of Public Welfare (DPW) required applicants to establish domicile in the state: both physical presence and the mental intent to remain in Pennsylvania. *Id.* at 651. DPW found that the plaintiff who had a severe intellectual disability did not have the capacity to form the requisite intent. *Id.* Judge Scirica explained that the essential nature of the program is to provide disability services for Pennsylvania residents, so residency is fundamental to the program. *Id.* at 653. However, DPW's requirement an applicant have the "mental capacity to choose domicile is not a criterion fundamental to participation in the program." *Id.* at 656-57. DPW failed to show how modifying this policy would fundamentally alter the nature of the MA reimbursement or program services. *Id.* DPW's failure to modify its policy by providing an exception illegally discriminated against all mentally disabled individuals who have lived in the county or state. *Id.* at 654; *see also*, *Independent Living Resources v. Oregon Arena Corp.*, 982 F. Supp. at 698; *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1084 (9th Cir. 2004) ("All aspects of the Theater and its policies survive the requested relief intact, save one: AMC must now ensure that companion seats are available to the companions of wheelchair-bound patrons until ten minutes

prior to showtime, even if a person not accompanying a wheelchair-bound patron refuses to move. This change will have a negligible effect - if any - on the nature of the service provided by the Theater: screening films.").

In the instant case, waiving the admission fee for Plaintiffs' personal care attendants will not alter the nature of the services provided by the FI in any way, let alone constitute a fundamental alteration. The FI's mission is to instill in adults and children "the spirit of inquiry and discovery, to inspire a passion for learning about science and technology." PSUF No. 13. The nature of the FI's programs is to offer the public the opportunity to explore and learn from its various permanent exhibits, engage with the Museum's interactive programs, view IMAX movies, and to visit and learn from the Special Exhibitions. PSUF No. 12-17. Admitting PCAs without an additional fee does not impede the nature of the FI's mission, services, or programming. Rather, it furthers the mission by affording more people with "the spirit of inquiry and discovery, to inspire a passion for learning about science and technology." PSUF No. 13.

Importantly, "[t]he Franklin Institute admits that its mission would not be altered by admitting PCAs to IMAX and Special Exhibitions without an additional surcharge." PSUF No. 14. The FI's failure to modify its policy to enable Plaintiffs to have equal enjoyment of its goods and services in the absence of such a fundamental alteration violates Title III of the ADA on its face. 42 U.S.C. § 12182(b)(2)(A)(ii).

Unlike concerts or sports venues, which have a limited number of seats for a one-time show for people with disabilities who require PCAs, the FI has virtually unlimited capacity and is not limited to a number of spaces. PSUF No. 72. In the instant case, the person with a disability sits in a designated ADA section of the IMAX Theater and her attendant can sit in a

folding an adjacent folding chair, so that the FI loses no fixed seats.   PSUF Nos. 72-78.

Moreover, of the hundreds of IMAX showings between January 2012 and January 2015, the FI

has only ever sold out of 9 shows.   PSUF No. 82.   And when the FI did sell out of shows, the

total number of tickets *exceeded* the 353 fixed seats by as many as 26.   PSUF Nos. 78, 82.   This

shows the "maximum capacity" of the IMAX Theater is not only fungible, but will in no way be

impacted by admitting Plaintiffs with their PCAs.   Indeed, the FI sold less than 50% of the fixed

seats for most of the IMAX films it screened.   PSUF No. 84.   Yet the FI stated it will charge

Plaintiffs who require a PCA an additional admission fee to enter the IMAX Theater even when

less than half of the seats are sold.   PSUF No. 85.

Similarly, for the Special Exhibitions, the museum has a more or less unlimited capacity

to admit and host individuals.   If capacity is ever reached for anyone timeslot, the person with a

disability and her/his PCA could be admitted at the next timeslot in 15 to 30 minutes, the same as

nondisabled people.   PSUF No. 86.   The greatest number of attendees per timeslot ranged from

249 to 364.   PSUF No 87.[10]   For the majority of the timeslots, the FI sold less than 100 tickets

per entrance time.   PSUF No. 88.

Permitting individuals with disabilities to have their personal care attendants assist them,

whether in the IMAX Theater, Special Exhibition, or anywhere else in the FI, without paying a

double admission fee, does not come close to a fundamentally altering the nature of the museums

"goods" or "services."   Not requiring persons with disabilities to pay an admission fee for a

personal care attendant does not impact whatsoever "the nature" of what the museum does.

PSUF No. 13.   The Plaintiffs are not asking to change any parts or aspects of the Special

Exhibitions, the IMAXs movies, or even seating arrangements.   Plaintiffs are solely asking to

---

[10] This is not the maximum number that could be admitted at one time.

have their personal care attendants accompany them without the double admission fee so that they can enjoy (and understand) the museum's goods and services the same as nondisabled individuals. PSUF No. 8. The continued refusal of the FI to modify its admitted policy of requiring an additional admission fee for the personal care attendant violates the ADA: waiving the double admission fee is a reasonable modification that does not fundamentally alter the museum's goods or services.

### 4. There is No Undue Burden Defense to 42 U.S.C. § 12182(b)(2)(A)(i)

There is no "undue burden" defense under Title III of the ADA regarding either eligibility criteria (including surcharges), 42 U.S.C. § 12182(b)(2)(A)(i), or  reasonable modification of policies.  42 U.S.C. § 12182(b)(2)(A)(ii).  Under Title III, there is an undue burden defense only for the "failure to take steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals *because* of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps … would result in an undue burden."  42 U.S.C. § 12182(b)(2)(A)(iii) (emphasis added).

The federal implementing regulations follow this statutory provision. Section 36.303 requires public accommodations to provide auxiliary aids and services  "unless the public accommodation can demonstrate that taking those steps would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations being offered or would result in an undue burden, i.e., significant difficulty or expense."  28 C.F.R. § 36.303.

In contrast, Section 36.302 requiring reasonable modifications provides for an exception only when "making the modifications would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations."   28 C.F.R. § 36.302.

Accordingly, there is no undue burden exception to the mandate that public entities make reasonable modifications to afford equal access to individuals with disabilities. Because Plaintiffs do not argue that the FI has a duty under the ADA to provide auxiliary aids and services, Section 36.303 and its undue burden defense is irrelevant to the instant action. Nevertheless, Plaintiffs address the undue burden issue, assuming *arguendo* it is relevant.

### 5. The FI Does Not Incur an Undue Burden to Modify Its Double Admission Fee Policy to Admit Plaintiffs with Their PCAs

An "undue burden" is a "significant difficulty or expense." 28 .C.F.R. § 36.303(a) (describing an undue burden under auxiliary aids and services). In Title II cases, courts have frequently merged the fundamental alteration and undue burden defenses. Although financial resources are relevant both to fundamental alteration and an undue burden defense, general allegations of fiscal difficulties, e.g., current budget deficiencies and budget cuts, are not sufficient to establish fundamental alteration defenses, nor do they establish an undue burden defense. First, an undue burden defense cannot be based "solely upon the conclusory invocation of vaguely-defined fiscal constraints." *Frederic L. v. DPW*, 364 F. 3d 487, 495-496 (3d Cir. 2004). Second, the ADA requires entities to bear significant costs even in light of budgetary constraints. *Pa. Protection & Advocacy v. Pa. DPW,* 402 F. 3d 374, 380-81 (3d Cir. 2005) (holding "it would have been legal error for the District Court to find a fundamental alteration solely on the basis of budgetary constraints"), Furthermore,

> [a] state cannot meet an allegation of noncompliance [with the ADA] simply by replying that compliance would be too costly or would otherwise fundamentally alter its noncomplying program. Any program that runs afoul of the [Rehabilitation Act] mandate would be fundamentally altered if brought into compliance. Read this broadly, the fundamental alteration defense would swallow the [Rehabilitation Act's] mandate whole... .

*Id.*

FI has produced no data, information, or evidence regarding either the number of PCAs or even the number of people with disabilities who have attended the IMAX or Special Exhibitions at the FI.  PSUF Nos. 40-44.  Incredibly, the FI did not even collect such information since the lawsuit was filed.  PSUF No. 40.  Accordingly, there is no evidence on the record supporting the FI's contention that providing the reasonable modification to enable Plaintiffs to have equal access to the FI would constitute an undue burden.

Other circuit courts have applied the same analysis as the Third Circuit.  For example, in *Fisher v. Colorado Dept. of Health*, 335 F. 3d 1175, 1182-83 (10th Cir. 2003), the Tenth Circuit held that "the fact that [a state] has a fiscal problem, by itself does not lead to an automatic conclusion that [the provision of a reasonable accommodation] will result in a fundamental alteration…. If every alteration in a program or services that required the outlay of funds were tantamount to a fundamental alteration, the ADA's [reasonable accommodation] mandate would be hollow indeed."  Similarly, in *Townsend v. Quasim*, 328 F. 3d 511, 520 (9th Cir. 2003), the Ninth Circuit noted that budgetary constraints alone do not establish a fundamental alteration defense. Instead, the Court looked at whether the asserted "extra costs would, in fact, compel cut-backs in services to other  recipients."  *Id.*

In a frequently-cited district court decision, *Nelson v. Thornburgh*, 567 F. Supp. 369 (E.D. Pa. 1983), aff'd 732 F. 2d 1461 (3d Cir. 1984), *cert. denied* 105 S. Ct. 955 (1985) (Pollak, J.), blind caseworkers sued under the ADA's predecessor, Section 504 of the Rehabilitation Act, arguing that Pennsylvania discriminated by not providing readers for blind caseworkers employed by DPW.  The plaintiffs argued the defendants had to provide a separate, half-time reader for each blind employee.  *Id.* at 379.  The court in *Nelson* reviewed DPW's entire budget,

including funds used for administration, and then compared the entire budget with the plaintiffs' incomes.

As in the instant case, in *Nelson*

[t]here is no claim in the present case that accommodation of these plaintiffs would entail substantial modifications of the requirements of the position or impose new administrative burdens. The claim is simply that the accommodation called for would cost too much. Thus, the arguments over 'otherwise qualified,' 'reasonable accommodation', 'undue burden', and 'affirmative action' all collapse into one issue: would the costs of providing half-time readers be greater than the Act demands?

*Id.* After discussing the cost of the accommodation, the Court held that DPW "must make such accommodations unless it 'can demonstrate that the accommodation would impose an undue hardship on the operation of the program.'[citing 45 CFR §84.12(a)]." *Id.* The Court explained "Congress was well aware that compliance with Section 504 could be costly…," and that the Fifth and Tenth circuits have required "states spend money to bring about reasonable accommodation." *Id.* at 380-81.

Financial costs and undue burdens have also been litigated under the Fair Housing Act Amendments.[11] In a case quite similar to the instant action, a private landlord required a disabled woman with a respiratory disease who needed a live-in Home Health Aide to care for her to pay both the $1.50 per day for "long-term guests" and $25.00 per month for guest parking

---

[11] Because "reasonable accommodation claims" are the same whether analyzed under the ADA or the FHA, with some exceptions, Courts have considered Plaintiffs' ADA and FHA claims in tandem. *See Smith v. New York City Housing Auth.*, 410 Fed. App'x 404, 406 (2d Cir. 2011) (summary order) (citing *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573 n.4 (2d Cir. 2003)) ("The FHA and the ADA impose similar anti-discrimination standards for persons who suffer from disabilities and, due to their similarities, can be analyzed 'in tandem.'"); *see also Hovsons, Inc. v. Township of Brick and Zoning Board of Adjustment of the Township of Brick*, 89 F.3d 1096 (3d Cir. 1996) ("A number of our sister circuits have held 'that in enacting the anti-discrimination provisions of the FHAA, Congress relied on the standard of reasonable accommodation developed under section 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 794'.") (citations omitted).

fees for the Aide, fees "generally applicable to all residents." *United States v. California Mobile Home Park Management Co.*, 29 F.3d 1413 (9th Cir. 1994). The Ninth Circuit explained

> [a]s the language of Section 3604(f)(3)(B) makes clear, the FHAA imposes an affirmative duty upon landlords reasonably to accommodate the needs of handicapped persons. … [citations omitted]. Defendants assert, nonetheless, that this affirmative duty does not entail any requirement that landlords "financially subsidize" the handicapped. We find the effort to distinguish accommodations that have a financial cost from other accommodations unconvincing.

*Id.* at 1416-17.

As in the present case, the question of additional fees to provide the same experience focuses on whether the requested modification in the ADA context and accommodation in the FHAA context are reasonable and necessary for the individual with a disability. If they are, then the public entity under Title II and the public accommodation under Title III must be bear the financial costs. As the *Mobile Home Park* court recognized, fees and costs

> have the potential to deny persons an 'equal opportunity to use and enjoy a dwelling' [and the FI's IMAX and Special Exhibitions] because of their handicap. There are, of course, many types of … fees that affect handicapped and non-handicapped … equally; such fees are clearly proper. Fees that merit closer scrutiny are those with unequal impact….

*Id.* There is no question that the double fees for the IMAX and Special Exhibition have an "unequal impact" on persons with disabilities who require PCAs to obtain the "equal opportunity to enjoy" those venues.

In the instant case, the FI has not introduced any evidence showing potential costs of changing its policy, let alone establishing that such costs are "unduly burdensome." The FI does not know how many people with PCAs have entered the FI, its IMAX Theater, or Special Exhibitions. PSUF No. 40. The FI does not even know how many people with disabilities or wheelchair users have entered. PSUF Nos. 79-80. The FI does not attribute any fixed costs specifically to admitting Plaintiffs with their personal care attendants. PSUF No. 55.

Accordingly, the only costs on the record pertain to "per head" or "per viewer" fees paid in fewer than half of all licensing agreements to screen IMAX movies and in *one* Special Exhibition licensing agreement.  PSUF Nos. 60, 67.

The FI paid the distributors a "per head" cost for eight of the 18 IMAX movies shown between 2012 and 2015 and a flat fee for all but one the Special Exhibitions on display during that time.  PSUF Nos. 58-59, 67.  Its per-head costs ranged from $85^{\mathcopyright}$ to $1.25 per viewer.  PSUF No. 60, 67.  Even where the FI contracts to pay a per-head fee, a number of contracts authorize the FI to issue complimentary admissions of up to 5% of total admissions without any per head costs to the FI.  PSUF Nos. 61-62.  The FI distributes complimentary IMAX tickets to certain memberships, to large donors, for marketing purposes, promotions, and other purposes.  PSUF Nos. 50-53.  Yet the FI does not even know how many free IMAX tickets it has distributed. PUSF No. 53.  If the cost of such admissions were truly "significant" the FI would at least track these expenses.

The FI routinely chooses to charge lower rates or free admission.   The FI charges lower General Admissions, IMAX Theater, and Special Exhibition rates to children, senior citizens, military service members, and groups.  PSUF No. 47.  The FI also chooses to charge a lower IMAX admissions fee to children merely "[b]ecause parents typically expect a discount for children."   PSUF No. 49. In fact, the FI granted free admission to a number of Special Exhibitions, despite paying $320,000 for one exhibit alone. PSUF No. 68.  These are costs and lost profits that the FI willingly accepts.

The FI says the failure to recoup undefined fixed costs constitutes a financial loss.  PSUF No. 74.   FI bears same fixed costs whether or not people with disabilities attend or personal care attendants attend.  PSUF No. 38.  The flat fee is the same whether 5 or 5000 people attend. The

same fixed costs apply to General Admissions.  Indeed, the FI does not even recoup all of its operating costs through the $19.95 it charges a single adult for General Admission. PSUF No. 56. Yet, the FI has stated its policy is to grant people with disabilities and their PCAs General Admission without an additional admission fee.  PSUF No. 22.  This demonstrates that the additional admission is truly a de minimus cost and cannot possibly meet the exacting standards of an undue burden. *Alumni Cruises*, 987 F. Supp. 2d at 1314 (finding a cruise ship was required to build a separate dance club to provide patrons with autism equal enjoyment of the ship's goods and services).

In fact, the FI makes a profit on each IMAX ticket sold to a person who requires a PCA to have equal access, even where the FI must pay the distributor a per-head or per-viewer fee. For example, the FI sold tickets to the movie Sharks for $6.00 each when bundled with General Admission.  PSUF No. 17. The FI's per-viewer fee owed to the film distributor was $1.25. PSUF No. 60.  Even if FI modified its policy to admit a PCA supporting a patron with disabilities without an additional charge, while at the same time requiring the person with the disability to pay $6.00 as her admission fee, the FI would only pay $2.50 to the distributor ($1.25 for the person with a disability and $1.25 for the PCA), retaining $3.50 in profit for the admission of both the person with a disability and the PCA.  PSUF No. 64.  Accordingly, if FI modified its policy as the ADA requires, the person with a disability's admission fee would cover the FI's cost per head for both the person with a disability and his/her PCA, and the FI would still make a profit.  PSUF No. 64.  Importantly, for the majority of IMAX and Special Exhibitions movies FI pays either only a flat fee or a combination per head and flat fee, so admission of the PCA without requiring payment does not cost the FI any money.  PSUF No. 58

("Where the contract charges a flat fee 'it doesn't matter whether it's five people who see the show or 5,000.' Collins Dep. at 104:15-105:8.").

What is critical here is that Plaintiffs have always acknowledged they had to pay for their own admission to the IMAX and Special Exhibitions. The FI makes a profit of $3.50 if the person with the disability bought one ticket. PSUF No. 63.   If the person with a disability who requires a personal care attendant to go to the IMAX does not go alone to the IMAX because she/he cannot afford to purchase a ticket for a PCA, the FI loses the $3.50 profit on one ticket when the Plaintiffs does not attend.

Similarly for Special Exhibitions, the FI paid a flat fee of $1 for only one Special Exhibition, "Pompeii."  PSUF No. 66.  All of the other Special Exhibitions licensing agreements were based on a flat rate.  PSUF No. 66.  FI charged admission fee of $ 11.00 to "Pompeii," even though it was under contract to pay the distributor only $1.00 per admission.  PSUF No. 67.  For all the other Special Exhibitions, the FI paid a fixed fee regardless of the number of people who attended and regardless of the number of PCAs who accompanied persons with disabilities. PSUF No. 66.

Finally, modifying its policy does not deprive the FI of profits from other patrons such that it could support an undue burden showing.  The majority of IMAX Theater shows and Special Exhibition time slots sold less than 50% of the maximum tickets available.  PSUF No. 84.   The FI *never* sold out of 14 of the 18 IMAX movies screened between 2012 and 2015, and there is no evidence on the record showing a 15- or 30-minute Special Exhibition time slot was sold out.  PSUF Nos. 82, 88.  In the nine IMAX shows that did sell out, the FI sold as many as 26 more tickets than the 353 fixed seats.   PSUF Nos. 82, 84.  Moreover, the FI has explained PCAs can sit on a folding chair adjacent to the person with a disability without occupying a fixed seat.

PSUF Nos. 74-80.  Yet, the FI asserts that it will charge an additional fee to admit a PCA to a half-empty IMAX theater.  PSUF No. 85.  This intractable position clearly violates the ADA's mandate to provide equal access to goods and services without imposing surcharges on people with disabilities.

These examples demonstrate that the undue burden is not a factually relevant defense in the instant action.  Defendant has not produced any evidence showing costs involved in waiving admission fees for personal care attendants and therefore cannot raise an undue burden defense when other available solutions would not cause discrimination.

### III.  <u>CONCLUSION</u>

Plaintiffs have produced uncontroverted evidence that they require the services of their personal care attendants to enjoy equal opportunity to benefit from the FI's goods, services, and facility.  Admitting a personal care attendant to support Plaintiffs is a reasonable modification in the run of cases.  The ADA prohibits public accommodations from charging a person with a disability a surcharge to provide a reasonable modification.  Allowing a personal care attendant to accompany is a reasonable modification mandated by the ADA.

The FI has failed to produce any evidence on this record that modifying its policy would alter the nature of its programs or services in any way.  Even if the FI can point to some small costs, the ADA requires public accommodations to incur those costs in order "to end discrimination against individuals with disabilities and to bring persons with disabilities into the economic and social mainstream of American life  . . . ."  H. Rep. No. 101-485, pt. 2, at 22-23 (1990).  No reasonable fact finder could find that the occasional $1 cost to the $135 million organization could constitute an undue burden, particularly in light of the fact that the FI routinely bears such costs and does not even measure how many free tickets it gives away.

Accordingly, the FI has not met its burden of proof to show a fundamental alteration or undue hardship exception to its ADA obligations to provide Plaintiffs with reasonable modifications to enjoy equal access to the FI.  The FI's policy and practice excludes Plaintiffs on the basis of their disability, and is illegal discrimination in violation of Title III of the ADA.

Respectfully submitted,

Dated:  December 1, 2015

By:      /s/ Stephen F. Gold
Stephen F. Gold
PA Bar No. 09880
1709 Benjamin Franklin Parkway
Second Floor
Philadelphia, PA 19103
215-627-7100 ext. 227

/s/ Julie Foster
Julie Foster
PA Bar No 314007
Public Interest Law Center
1709 Benjamin Franklin Parkway
Second Floor
Philadelphia, PA 19103
215-627-7100

Attorneys for Plaintiffs