**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL ANDERSON and** | : | |
| **Vision for Equality, a Non-Profit Corporation,** | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| | : | **No. 13-5374** |
| **v.** | : | |
| | : | |
| **THE FRANKLIN INSTITUTE,** | : | |
| **Defendant.** | : | |

**MCHUGH, J.**                                                                                   **MAY 6, 2016**

**<u>MEMORANDUM OPINION</u>**

*"Well done is better than well said." -Benjamin Franklin*

Plaintiffs initiated this suit under Title III of the Americans with Disabilities Act

("ADA"), 42 U.S.C. §§ 12181 *et seq.*, and the corresponding federal regulations, 28 C.F.R.

§§ 36.101 *et seq.*, based on Defendant The Franklin Institute's alleged failure to grant disabled

persons full and equal access to its facilities.  Specifically, Plaintiffs argue that The Franklin

Institute discriminates against people with disabilities by charging an additional and separate

admission fee to government-funded personal care attendants, whose sole purpose is to provide

severely disabled individuals with the opportunity to fully participate in the services offered by

the museum.  Plaintiffs' claims encompass fees for general admission as well as admission to

Defendant's IMAX Theater and Special Exhibitions.

A person eligible for a personal care attendant is someone who requires assistance with

activities of daily living virtually around the clock.  For reasons that still remain opaque to me, at

the outset of this litigation, The Franklin Institute insisted that charging attendants for admission,

thereby effectively doubling the cost of admission for this class of disabled citizens, did not even

1

raise a colorable issue under the ADA.  Defendant's position on its obligations under the Act, and its characterization of its previous practices, have evolved significantly over the course of this litigation.  Its principal position now seems to be that there is no need for the Court to rule.  I have little difficulty in concluding that Plaintiffs remain entitled to injunctive relief requiring modifications that will permanently allow full and meaningful access to The Franklin Institute.

## I.      FACTUAL BACKGROUND

Plaintiff Michael Anderson is a severely disabled person who requires assistance with all aspects of daily living.  Specifically, Anderson requires a personal care attendant ("PCA") twenty-four hours a day, seven days a week, to assist with eating, dressing, toileting, bathing, manual dexterity, safety, and physical mobility, including transfer to and from bed and wheelchair direction, among other activities.  S. McCoy October 28, 2015 Declaration at ¶¶ 8–9.  Anderson's mother, Susan Tachau, attests, "My son has very little control over his body."  S. Tachau October 28, 2015 Declaration at ¶ 9.  Describing Anderson's condition in greater detail, Tachau explains, "He cannot shift his body position and cannot do any weight changes without his personal attendant's assistance.  His personal attendants adjust the wheelchair and pull him upright to avoid decubitus ulcers. . . . He requires readjustment in his wheelchair about two times every hour.  If his head falls to one-side, the personal attendants must straighten his head."  *Id.*; *see also* S. Tachau October 13, 2015 Deposition at 14:9–18 ("[PCAs help Michael] go to the bathroom, prepare his foods, feed him, help him direct his wheelchair, help him read by pulling up things on the computer, turning on the computer, driving his wheelchair accessible van, cleaning his room, making his bed, turning on the fans, washing his shower chair, taking him into the bathroom, giving him a shower.   All aspects of all activities of daily living.").

The importance of such services is recognized by Pennsylvania's Attendant Care Services Act, 62 Pa. Stat. Ann. § 3051, *et seq.*, which declares a public policy of supporting services that will allow adults to "live in their own homes and communities."  62 Pa. Stat. Ann. § 3502.  Based on the extensive nature of his disabilities, Anderson qualifies for the Pennsylvania Department of Human Services' ("DHS") Medicaid Waiver program, which sponsors and funds PCAs.  Tachau Decl. at ¶ 7.  He "has been approved for these personal assistance services 24 hours a day by the Pennsylvania Department of Human Services since the year 2000." *Id.*; McCoy Decl. at ¶¶ 4–7 ("I have been employed and paid to provide Michael with his attendant care services through the Pennsylvania Medical Assistance Waiver program. . . . As Michael's [PCA], I am hired and paid by Neighborly Home Care, a private agency, and am assigned to provide Michael with attendant care services . . . based on his Individual Service Plan.").  Despite the existence of this statute, Defendant seems to profess some doubt about the importance of such assistants, noting that it "is not aware of any official definition" for a PCA, and that it adopts the term merely as a matter of "convenience."  Defendant the Franklin Institute's Memorandum of Law in Support of Its Motion for Summary Judgment (hereinafter, "Defendant's Motion") at 1 n.1.  Defendant might be technically correct that the Attendant Care Services Act does not set forth a formal legal definition of a PCA, but it certainly describes in extensive detail the important role played by such individuals.[1]

Without the assistance of a PCA, Anderson cannot "ambulate through the Franklin Institute, engage in any of the interactive exhibits, use the restrooms, drink water, take necessary medications, consume food at necessary intervals, and safely move around the museum, Special Exhibitions, and IMAX, and/or enter the IMAX Theater and safely view the IMAX film."

---

[1] *See, e.g.,* 62 Pa. Stat. Ann. § 3053 (defining "Attendant care services" as "Those basic and ancillary services which enable an eligible individual to live in his home and community rather than in an institution and to carry out functions of daily living, self-care and mobility.").

Plaintiffs' Statement of Undisputed Facts ("PSUF") at ¶ 5.  For example, in order for Anderson to attend the IMAX screening of Sharks, his PCA "had to hold the door for Michael to enter the Theater, which was dark inside and which he could not open by himself, and [had] to guide his wheelchair into the area designated for wheelchairs in the rear of the Theater on the upper level." McCoy Decl. at ¶ 22.  Anderson's PCA further explained that upon entering the IMAX Theater, he found a folding chair near the entrance, allowing him to sit "next to Michael in this folding chair throughout the movie.  I also assisted him when he wanted to drink water by holding the water bottle with a straw so he could drink . . . .  After the movie, I assisted him to go to the toilet."  McCoy Decl. at ¶¶ 24–25.

Plaintiff Vision for Equality ("VFE") is a Pennsylvania non-profit organization that provides training, outreach, and support services to individuals with intellectual and developmental disabilities and their families.  As explained by co-Executive Director Audrey Coccia, VFE also "provides advocacy for persons with intellectual disabilities and/or autism to obtain the services they require to live as independently and integrated as possible in the community."  A. Coccia November 4, 2015 Declaration at ¶¶ 2, 15.  VFE works with between 500 and 900 disabled people annually.  *Id.* at ¶ 16.  VFE does not have a "membership" list, but provides its services generally to "people with disabilities who benefit from and require support persons to assist them with these disabilities."  *Id.* at ¶ 19.  Nearly all of the individuals VFE serves have PCAs funded by the Pennsylvania DHS' Medicaid Waiver program.  *Id.* at ¶ 16.

Defendant The Franklin Institute ("FI") is a non-profit, educational science museum that offers general admission and limited-capacity admission to Special Exhibits and IMAX and Franklin Theater cinematic presentations.  FI "states its mission as, 'In the spirit of inquiry and discovery embodied by Benjamin Franklin, the mission of The Franklin Institute is to inspire

passion for learning about science and technology.' "  Defendant's Opposition to PSUF at 13. Ticket prices to FI vary depending on the type of visit.  PSUF at ¶¶ 16–20.  An individual can purchase a general admission ticket or a package including general admission and admission to either the IMAX Theater or a Special Exhibition.  PSUF at ¶¶ 17–18.  FI also provides for several membership options, including dual membership, where the member can designate one companion as his or her "guest," triggering complimentary admission under the membership plan.  Collins Dep. at 165:5–22.

In general, FI does not track how many people with disabilities accompanied by PCAs have visited FI, attended an IMAX Theater film, or attended a Special Exhibit.  PSUF at ¶ 40. Since this lawsuit was filed on September 16, 2013, FI has continued its practice of not tracking the number of disabled people accompanied by PCAs that patronize the museum.  Collins Dep. at 255:7–12.  Similarly, FI did not meaningfully respond to Plaintiffs' Document Request regarding the potential cost of waiving the admission fee for PCAs and admits it has never calculated the potential cost of admitting PCAs at no charge.  PSUF at ¶ 35; *see also* Defendant's Opposition to PSUF at ¶ 35 (failing to deny these allegations).  FI "has never determined and has produced no documentary [evidence regarding what minimum dollar amount of lost revenue] might influence whether or not the Franklin Institute would change its policy [about PCA admission]."  PSUF at ¶ 36.[2]  When asked why FI refuses to admit PCAs free of charge for limited capacity events, Troy M. Collins, FI's 30(b)(6) corporate witness, testified, "Both our

---

[2] I note that there is some confusion in the record regarding whether this fact is "undisputed," as represented by Plaintiffs.  The parties have, however, agreed to resolution of the case by cross-motions.  As a matter of procedure, Plaintiffs submitted a "Statement of Undisputed Facts in Support of Plaintiffs' Motion for Summary Judgment." Defendant filed a response, objecting to some of the facts Plaintiffs characterized as undisputed.  It did not, however, object to any aspect of paragraph 36.  I will therefore accept as an undisputed fact FI's failure to collect data related to this lawsuit.

theaters and our special exhibits have limited capacity and enormous incremental costs. We simply can't afford it." Collins Dep. at 230:1–231:16.

With respect to FI's IMAX Theater, it has two areas that can be used for individuals in wheelchairs. PSUF at ¶ 73; Defendant's Admission No. 82. Approximately five wheelchairs can fit in each area, for a maximum total of ten wheelchairs per theater. Collins Dep. at 107:10–110:23. There are 353 fixed seats arranged in 14 rows in the IMAX movie theater, and access to 13 of those 14 rows of seats requires the use of steps. PSUF at ¶ 75; Defendant's Admission Nos. 81, 84–85. Of those 353 fixed seats for abled-bodied persons, "there are two permanently attached seats where a personal attendant could sit adjacent to a person with a disability who uses a motor wheelchair." Defendant's Admission No. 90. In addition to the two fixed seats available to PCAs, FI provides portable folding chairs to enable PCAs to sit adjacent to his/her disabled client in the ADA section of the IMAX Theater. PSUF at ¶ 74; Collins Dep. at 107:10–109:11, 289:23–290:2; McCoy Decl. at ¶ 24; Defendant's Admission No. 90.

In general, if FI "sells out" of tickets to the IMAX Theater for any individual showing, the term "sold out" refers to fixed seats only, meaning that wheelchair spaces and folding chairs may remain available. PSUF at ¶ 77. Collins explained, "if we are sold out, the technical term sold out, it would mean that every single seat is full . . . I don't think we sell the folding chairs as tickets. It's just not good customer service. So, technically we could still have space available, but they could all be wheelchair spaces." Collins Dep. at 229:16–24. It necessarily follows that because of the additional tickets available for the "wheelchair locations," it is possible for FI to accommodate more patrons than the 353 assigned to fixed seats. Collins. Dep. at 109:24–110:23. Accordingly, any calculations or statistics related to the proportion of tickets sold or whether the IMAX Theater was "sold out" in specific instances do not take into account

handicapped seating.  *See id.*  The parties have submitted a great deal of financial evidence related to the IMAX Theater that I consider largely irrelevant, as these numbers concern fixed seating for able-bodied persons and do not include figures for handicapped seating.  *See, e.g.,* PSUF at ¶¶ 58–64; 81–85; Defendant's Opposition to PSUF at same.

Despite the fact that the folding chairs in which PCAs sit would otherwise never be offered to paying patrons, and as a result are not even contemplated in the IMAX Theater revenue statistics, FI persists in arguing that free admission for PCAs would amount to lost revenue, "[b]ecause they haven't paid for their ticket."  Collins Dep. at 290:3–9.  Seeking further clarification on this topic, Plaintiffs' counsel inquired, "But it's not like an able bodied person is going to sit in a temporary chair?"  Collins Dep. 290:10–11.  Collins responded, "No, but that – it's still lost revenue.  If you always have been charging for PCAs for IMAX and you don't, that's lost revenue."  *Id.* at 290:12–15.  Notably, FI does not have any information about the number of persons in wheelchairs that have attended the IMAX for any individual movie.  PSUF at ¶ 79.  Specifically, FI does not know if more than five patrons in wheelchairs were ever in attendance at any one movie.  PSUF at ¶ 79.  Similarly, FI has not maintained any data regarding how many times it has provided folding chairs to be used in the handicapped section of the IMAX Theater.  Collins Dep. at 109:12–14.

With respect to special temporary exhibits, access requires purchasing "a ticket allowing entry at a specific date and time.  Once the pre-set number of tickets for that time is sold, no additional tickets may be purchased and that time slot is 'sold out.' "  PSUF at ¶ 72.  Generally, admissions to Special Exhibitions are based on 15 to 30 minute intervals, with a maximum number of patrons per interval that can trigger "sold out" status.  PSUF at ¶ 86.  For five Special Exhibitions since 2012, FI paid a flat licensing distributor fee independent of the number of

patrons who paid admission.  PSUF at ¶ 66.  During that same time period, FI only paid a per-ticket licensing fee to the distributor of one Special Exhibit in the amount of $1 per ticket sold.  PSUF at ¶ 67; Defendant's Opposition to PSUF at ¶ 67.

FI admits that in the year ending December 2012, its net assets amounted to $115,466,830 and its total assets equaled $144,372,450, as stated on its Form 990.  Defendant's Admission No. 39.  In 2014, FI had $134,998,336 in net assets.  Defendant's Opposition to PSUF at ¶ 33; PSUF at ¶ 33.  When questioned whether admitting PCAs to the IMAX and/or Special Exhibits would "in any way change the nature, the experience of the Franklin Institute," Collins testified that it would only impact FI economically in the form of lost revenue.  Collins Dep. at 307 at 3–19.  FI admits to losing money on a number of other admirable "mission-based programs," including the Pursuing and Achieving Careers in Technology and Science ("PACTS") program, which benefits underserved and low-income youth.  PSUF at ¶ 38; Collins Dep. at 298:14–307:2.  FI also gives away free "complimentary" tickets as awards for promotional contests and thank-you gifts to donors as well as to certain employees as a perk of their job with the company.  PSUF at ¶ 37; Collins Dep. at 202:17–204:14.

Procedurally, this is a unique case because in some ways the objectives of the litigation have been met.  As explained in great detail below, FI's admission policies for PCAs have evolved over the course of these proceedings.  Strikingly, Defendant even announced one such policy for the first time in their responsive papers to the pending Motions.  Nonetheless, as Plaintiffs cogently point out, FI's voluntary alignment with Plaintiffs for purposes of this litigation is one thing—permanent relief awarded via Court Order is another.[3]  As noted above,

---

[3] In fact, the importance of this distinction manifested itself during oral argument on Defendant's Motion to Dismiss, when counsel for Plaintiffs sought to invoke a previous settlement as authority for his position and was forced to concede that the precedential value of a settlement, even a good settlement, is "nil."  *See* Transcript of September 23, 2014 Hearing on Defendant's Motion to Dismiss (hereinafter, "Motion to Dismiss Argument Transcript") at 23.

Defendant did not initially move to dismiss this case as moot.  Rather, it contended Plaintiffs

stated no claim under the ADA.  Given the late onset of Defendant's change of heart, Plaintiffs

fear it has strategically adopted these policies on a temporary basis in an effort to defuse this

litigation.

Against that backdrop, the parties have formally cross-moved for summary judgment on

the remaining three claims of Plaintiffs' Complaint: Count I – Equal Opportunity, Count II –

Reasonable Modifications, and Count III – Methods of Administration.  The well-established

standard of Federal Rule of Civil Procedure 56(a), as amplified by *Celotex Corp. v. Catrett,* 477

U.S. 317, 322 (1986), controls.  When confronted with cross-motions for summary judgment, the

" 'court must rule on each party's motion on an individual and separate basis, determining, for

each side, whether a judgment may be entered in accordance with the Rule 56 standard.' "

*Schlegel v. Life Ins. Co. of N. Am.,* 269 F. Supp. 2d 612, 615 n.1 (E.D. Pa. 2003) (quoting

Charles A. Wright, Arthur R. Miller *et al.*, 10A *Fed. Prac. and Proc.* § 2720 (3d ed. 1998)).

## II.    DISCUSSION

Plaintiffs argue that FI discriminates against severely disabled individuals by charging an

additional admission fee to PCAs for general admission as well as admission to limited capacity

events, including the IMAX Theater and Special Exhibits.  Defendant counters that it has

adopted a formal policy to grant PCAs free general admission, and it has no legal obligation to

admit PCAs free-of-charge to limited capacity events, particularly in light of allegedly

controlling U.S. Department of Justice ("DOJ") guidance and regulations addressing ADA

requirements specifically in the context of ticket sales, promulgated by the DOJ Disability Rights

Section.

9

### a. Plaintiffs' Claim for Free General Admission for PCAs is Not Moot.

Defendant strenuously contends that Plaintiffs' principal claim regarding FI's allegedly

discriminatory policy of failing to offer PCAs free general admission is moot.  FI—somewhat

incredibly given the record in this case —avers:

> The Franklin Institute's policy is, and has been since before the beginning of this
> Action, to allow individuals with severe disabilities, such that they require
> personal assistive services, including from a personal care attendant or "PCA,"
> provided or paid for by a public agency such as the Pennsylvania Department of
> Human Services (formerly the Pennsylvania Department of Welfare), to visit the
> museum without a charge for the general admission of one PCA accompanying
> the disabled patron when 1) a general admission ticket is purchased by or for the
> disabled patron; 2) the disabled patron uses a current Franklin Institute
> membership; or 3) the disabled patron has a complimentary admission.

Defendant's Motion at 3–4.  As Defendant puts it, in somewhat euphemistic terms, this policy

"needed further emphasis recently," presumably in response to the evidence proffered by

Plaintiffs.[4]  30(b)(6) Witness Troy M. Collins October 12, 2015 Deposition at 268:11–14.  FI

further admits that it could not locate any written proof or other documentation of this policy that

predates the spring of 2015.  *Id.* at 269:2–23.  FI's current characterization of its own policy

stands in stark contrast to the position it advanced at the pleadings stage.  In fact, FI's Motion to

Dismiss Plaintiffs' Complaint opened with bold statements to the contrary:

> Plaintiffs, who are disabled, allege violations of Title III of the Americans with
> Disabilities Act (the "ADA") and its implementing regulations, 28 C.F.R. Part 36,
> because their "personal attendants" are required to pay admission to the Franklin
> Institute.  *See* Complaint ("Compl.") at ¶¶ 4–5.  Despite Plaintiffs' attempts to
> fashion a cause of action where one does not exist, Franklin Institute is not
> required – *and Plaintiffs have not cited to any authority* – under the ADA, its
> implementing regulations, the Department of Justice ("DOJ"), or any other
> agency guidance, to provide Plaintiffs' personal attendants, companions, or any
> accompanying individuals with complimentary, or even discounted, admission.
> Rather, DOJ guidance on ticket sales *explicitly* states that individuals are expected
> to purchase tickets for their companions.

---

[4] FI's recent attempt to "emphasize" its policy of free general admission for PCAs has included posting copies of the policy and informing new-hires about the policy as part of its onboarding training program.  Collins Dep. 274:11–276:19.

Defendant's Memorandum of Law in Support of Its Motion to Dismiss Plaintiffs' Complaint at 1.

Defendant's denial that it owed any responsibility to Plaintiffs under the ADA was consistently advanced both in their briefing on the Motion to Dismiss and at oral argument.  It analogized Plaintiffs' requested modification to a parent accompanying a minor child or a professional tour guide seeking free admission: "[I]t is not discrimination nor is it a denial of the full and equal enjoyment of the privilege of visiting the Franklin Institute as defined by the ADA and its implementing regulations to require every individual to purchase an admission ticket to enter the facility, whether they are a patron of the museum, a paid companion, a personal attendant, a parent accompanying a minor child, or a tour guide who is there for professional reasons only." *Id.*[5]  This ignores the fact that in enacting the ADA, Congress aimed to address discrimination specifically against *disabled* individuals—children are not covered.

Similarly, at the start of this suit, defense counsel went as far as to proffer that "[t]here's nothing that's ever required that you give away a ticket for free.  And there are a multitude of people who are disabled – I think there's up to . . . 20 million in the United States.  So I mean if Congress wanted to do that, they'd know how to do it." *Id.* at 8.  In denying Defendant's Motion

---

[5] During argument, counsel equated the experience of a child receiving assistance from a parent to a disabled person receiving assistance from a government-funded PCA:

> [A] child cannot go there alone, someone who can't drive couldn't go there alone.  And what the law does make clear is that you don't have to go above and beyond and provide something that you wouldn't be providing to the general public, like a free ticket. . . .  The mother doesn't care to see anything there . . . the little child wouldn't enjoy the exhibits either if they couldn't sit up and reach them.  They might need somebody else, but what the law requires is equal access.  No one here has been denied the opportunity to participate in a benefit, good, service, facility, privilege at the Franklin Institute, nobody.

Motion to Dismiss Argument Transcript at 3, 18, 36.  Plaintiffs understandably take offense at the condescending nature of that analogy.  Children need supervision because they are not capable of managing their own affairs.  Anderson is totally capable but he needs physical support.  Indeed, by statute, in order to have a PCA, an individual such as Anderson must be able to manage his own legal and financial affairs, and be able to hire, fire, and supervise the PCA.  62 Pa. Con. Stat. Ann. § 3053.

from the Bench, I quoted Justice Frankfurter's opinion in *Dennis v. United States*, where he observed that that "there is no greater inequality than the equal treatment of unequals." 339 U.S. 162, 184 (1950) (Frankfurter, J., dissenting).

Against this backdrop, Plaintiffs are understandably hesitant to give credence to Defendant's position that FI's policy has *always* been to allow PCAs to receive free admission when assisting a severely disabled patron. Moreover, Plaintiffs have submitted admissible evidence that FI's *practices* of charging PCAs an additional fee for general admission runs counter to the purported "policy" as described in Defendant's papers.[6] For example, on July 24, 2013, following a phone call between Anderson's mother and a FI ticketing representative regarding FI's admission policies for PCAs, Anderson received the following letter from Kelli M. Buchan, FI Director of Membership and Group Sales, reproduced here in full:

> Dear Michael,
>
> Thank you for expressing your concern regarding the handling of medical assistant ticketing as it pertains to visitors with varied conditions and disabilities.
>
> After a thorough review of current [ADA] regulations and state accessibility requirements, it has been confirmed that our policy regarding medical assistants accompanying guests to The Franklin Institute is in full compliance with the law. We make available appropriate ticket arrangements for your attendant, in order for you both to experience the components of a museum visit together. Under your [Dual] Membership coverage, your attendant was eligible to receive the same free General Admission that you did; however all ticketed upgrades such as special exhibitions and theater shows remain subject to additional fees for both parties.
>
> Based on the above, your father who, along with your mother, purchased the Membership as a gift to you, indicated that you no longer wanted to remain a Member of The Franklin Institute. At his request, a full refund and cancellation of the Membership has been processed.

---

[6] Defendant responds that Plaintiffs' evidence regarding disabled patrons whose PCAs did not receive free general admission to FI are at most "isolated incidents," which standing alone do not suffice to establish a systemic deficiency. But FI's opening defense was not that the Institute had policies and procedures to assure compliance, but that it had no obligation under the ADA. Absent a clear policy, it is difficult to accept that such experiences were indeed "isolated."

We will continue to keep abreast of changes in accessibility requirements and make appropriate modifications as warranted for opportunity and access to all members of the public.  While we understand your position on this matter, we appreciate your past years of support and visitation of the museum, and hope you will consider returning to visit The Franklin Institute at some point in the future.

If you have any questions or concerns, please do not hesitate to contact me at [phone number] or [e-mail address].

Kind Regards,

Kelli M. Buchan
Director of Membership and Group Sales
The Franklin Institute

Tachau Decl. at Exhibit 1.

It is clear from the face of the letter that the PCA was admitted, because, in Anderson's words, "I bought my dual membership in 2013. . . . My PCAs did not pay a separate general admission because my PCAs were considered my 'guest' and therefore under my dual membership, they did not have to pay separately.  I was told that I needed to pay for [my PCAs] to accompany me to IMAX and special exhibitions."  M. Anderson August 31, 2015 Declaration at ¶ 5.  It was Plaintiff's *membership* status, for which he had *paid*, and not FI's ADA policy, that effectuated "free" admission.

Similarly, when Anderson visited FI on December 31, 2014 accompanied by PCA Solar McCoy, an FI salesperson informed them that McCoy's admission would be complimentary that day but Anderson would have to pay a "child's" General Admission fee for McCoy to enter during future visits.  McCoy Decl. at ¶¶ 14–17; Anderson Decl. at ¶ 7 ("[On December 31, 2014], a Franklin Institute ticket seller told me that in the future, I would have to pay a reduced rate (the child's rate) for my PCA for general admission.").  Anderson has not returned to FI since December 31, 2014.  Anderson Decl. at ¶ 8.

Plaintiffs submit further proof that as recently as June 2015, FI staff told patrons with disabilities that their accompanying PCAs could either be admitted as their "guest" through the purchase of a more expensive dual membership or be admitted through the purchase of a separate ticket.  R. Landsman October 29, 2015 Declaration at ¶¶ 27–29 ("I telephoned the Franklin Institute's membership office in June, 2015.  I told the person in the membership office that Mitchell used a wheelchair and required a personal attendant.  I asked if an 'individual membership' would permit a paid personal care attendant to gain General Admission without having to pay.  I was told that the personal care attendant would have to pay."); Coccia Decl. at ¶¶ 8–9 ("[On February 1, 2015], The Franklin Institute required Gina to pay an additional $19.95 General Admission for her [PCA]").  Plaintiffs argue that this anecdotal evidence from fact witnesses conclusively proves that even if FI has adopted a formal policy of admitting PCAs free of charge, it has not followed its own policy in practice.[7]

The U.S. Constitution prohibits courts from taking jurisdiction over disputes that do not involve a justiciable case or controversy.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Here, I have no question that a live controversy exists.  While FI may have adopted a formal policy or attempted to formalize a previously existing informal policy in an effort to moot Plaintiffs' claim, its recent practice of failing to enforce its own self-proclaimed policy entitles Plaintiffs to seek declaratory and injunctive relief.  *Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) ("As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."); *ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*,

---

[7] Defendant objects to Plaintiffs' submissions from fact witnesses other than Anderson and VFE.  If Defendant disputed the accuracy of the statements, and advanced counter-evidence, consideration of the submissions on cross-motions for summary judgment might be problematic.  But FI's objection goes to relevance, not truthfulness.  More importantly, the submissions do not address the core issue before me—whether admitting PCAs for free is required under the ADA.  Rather, the submissions address only the issue of mootness, and whether formal adjudication is required to vindicate Plaintiffs' rights.  For that limited purpose, as ancillary evidence relevant to the procedural posture of the case, I will consider them.

485 F.3d 85, 94 (2d Cir. 2007) ("Mootness, in the constitutional sense, occurs when the parties

have no 'legally cognizable interest' or practical 'personal stake' in the dispute, and the court is

therefore incapable of granting a judgment that will affect the legal rights as between the

parties."); *see also Honig v. Doe*, 484 U.S. 305, 306 (1988) ("[T]he conduct Smith complained

of is 'capable of repetition, yet evading review.'  Thus his EHA claims are not moot.").

Of greater significance here, this case falls within a specific rule on mootness, which

provides that voluntary termination of an allegedly illegal practice does not divest the Court of

jurisdiction.  As eloquently explained by our Supreme Court in 1953:

> [The] voluntary cessation of allegedly illegal conduct does not deprive the
> tribunal of power to hear and determine the case, i.e., does not make the case
> moot.  A controversy may remain to be settled in such circumstances . . .  The
> defendant is free to return to his old ways.  This, together with a public interest in
> having the legality of the practices settled, militates against a mootness
> conclusion.  For to say that the case has become moot means that the defendant is
> entitled to a dismissal as a matter of right . . .  The courts have rightly refused to
> grant defendants such a powerful weapon against public law enforcement.

*United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953) (internal citations omitted).   The

continuing evolution of Defendant's position over the course of this litigation justifies Plaintiffs'

insistence upon formal adjudication.[8]

I therefore hold that Plaintiffs' chief claim regarding a right to free general admission for

PCAs is not moot.

---

[8] In a related context, discussed *infra*, Plaintiffs frame their concern as follows:

> In the futile hope that adopting new policies might avoid condemnation of its previous policies,
> Franklin Institute announced several new policies for the first time in its memorandum of law
> opposing Plaintiffs' summary judgment.  Defendant woke up one morning and decided to
> arbitrarily admit people with their PCAs at no additional charge when the IMAX Theater or
> Special Exhibition were less than 85% full.  Without the declaratory and injunctive relief Plaintiffs
> seek in this action, Defendant can wake up tomorrow and again change its policies.

Plaintiffs' Reply Brief at 1.

### b. Plaintiffs Have Standing to Challenge FI's Alleged Discriminatory Practices.

Defendant further argues that Plaintiffs lack standing to bring their primary claim regarding free general admission for PCAs.[9]  The Supreme Court set forth the three elements of standing in *Lujan*:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized … and (b) "actual or imminent, not 'conjectural' or 'hypothetical,' " ….   Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." …. Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

504 U.S. at 560–61 (internal citations omitted).  Furthermore, " 'a plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought."  *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (citing *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 352 (2006)).

Defendant's challenge to Anderson's standing focuses on the first element, "injury in fact."  FI avers that Anderson's PCAs have not been charged general admission when accompanying him to the museum, consistent with FI's alleged policy of free general admission for PCAs.  Consequently, Defendant contends that Anderson has not suffered any cognizable injury.  Anderson counters that he did in fact pay a general admission fee for his PCAs in recent years as part of FI's dual membership program, "which costs $25 more per year than an Individual Membership, so that he could have his PCA accompany him as his fictitious 'guest.' " Plaintiffs' Opposition to Defendant's Motion at 2.  Defendant in turn replies that this does not suffice because Anderson received a full refund of his dual membership at his request prior to initiating this action.  Anderson Decl. at ¶ 6; Tachau Decl. at Exhibit 1.

---

[9] FI concedes that Anderson has standing to challenge its policies regarding the IMAX Theater and Special Exhibitions.

I am satisfied that Anderson has individual standing to press his free general admission claim under the ADA.  In order for Anderson and his PCA to be admitted to FI in recent years, he had to upgrade his membership to "dual" membership, which required an additional payment. Receipt of a refund strips Anderson of standing only if Defendant has policies and practices currently in place that allow appropriate access.  The record in that respect is at best equivocal. The Institute's July 24, 2013 letter recognizes that Anderson's PCA was admitted because he had purchased a dual membership.  Its reference to ADA-compliant policies is notable for its vagueness.  In addition, as recently as December 2014, Anderson was informed that his PCAs would be charged a reduced child's fee for admission, serving as further proof that any policy of complimentary PCA admission was not being followed in practice.  Defendant appropriately highlights evidence in the record that in the recent past, PCAs have been admitted to FI free of charge on occasion, but the record lacks evidence that such admissions were the result of a formal, dependable, institutionalized policy that Anderson could expect to rely on in the future.

Anderson further submits that it would have been futile for him to return to FI after receiving the July 2013 letter and being informed by a ticket seller in December 2014 that his PCA would be charged a child's admission fee, thereby establishing an injury under the deterrent effect doctrine.  My colleague Judge Surrick recently provided a superb summary of the rule:

> The alternative method of showing an injury in fact to support injunctive relief is referred to as the deterrent effect test.  Under the deterrent effect test, a plaintiff is considered to have suffered an actual injury when he or she is deterred from patronizing a public accommodation because of accessibility barriers.  To satisfy this test, a plaintiff must show that he or she has actual knowledge of barriers preventing equal access and a reasonable likelihood that the plaintiff would use the facility if not for the barriers. . . . [T]he ADA "expressly contemplates loss of opportunity as an actionable injury."  In addition, Title III explicitly does not require "a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization ... does not intend to comply [with Title III of the ADA]."  The Supreme Court has also supported a broad approach of showing an injury in fact in Title III ADA cases.

*Garner v. VIST Bank*, No. 12-5258, 2013 WL 6731903, at *6 (E.D. Pa. Dec. 20, 2013) (internal citations collecting cases omitted).  Here, Anderson was clearly deterred from visiting FI on a regular basis despite his desire to do so.  Tachau Decl. at ¶ 17 ("He wants to visit the Franklin Institute on a regular basis, as he has done in the past, but will do so only if he does not have to pay admission for his personal care attendant to assist him in the IMAX Theater or Special Exhibitions.") and Exhibit 1 (expressing appreciation on behalf of FI for Anderson's years of support and visitation and requesting that Anderson consider returning to FI at some point in the future despite its PCA admission policies).

Taken together, Anderson's initiation of this suit and FI's initial response that it had a legal right to charge PCAs for general admission are sufficient to show "actual knowledge of barriers preventing equal access and a reasonable likelihood that the plaintiff would use the facility if not for the barriers."  *Garner*, 2013 WL 6731903, at *6.  In turn, I am persuaded that Anderson was deterred from patronizing FI due to his actual notice of accessibility barriers.  Anderson therefore has standing to seek relief to avoid a "real, immediate, and direct" prospective injury.  *Davis*, 554 U.S. at 734; *City of LA v. Lyons*, 461 U.S. 95, 102 (1983) ("Past wrongs were evidence bearing on 'whether there is a real and immediate threat of repeated injury.' "); *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1041 (9th Cir. 2008) ("Allegations that a plaintiff has visited a public accommodation on a prior occasion and is currently deterred from visiting that accommodation by accessibility barriers establish that a plaintiff's injury is actual or imminent.").  Under the totality of the circumstances, Anderson has suffered a cognizable injury for purposes of standing.

Because Anderson has standing to maintain this action, and Plaintiffs both advance the same position regarding FI's alleged discriminatory practices under the ADA, I do not need to

reach the more complex question of whether VFE has standing.  *Bowsher v. Synar*, 478 U.S. 714, 721 (1986); *Shumaker v. Nix*, 965 F.2d 1262, 1264 n.1 (3d Cir. 1992) ("Because Schumacher has standing to maintain this action, and Schumacher and Hodge present identical challenges to Rule 203(a)(2)(ii), we need not consider whether Hodge would have standing to bring this action individually.")[10]  Accordingly, I turn to the merits of this action.

### c.   Merits Analysis – Violation and Proposed Remedy

Although there are technically three counts remaining, I agree with Defendant that the substance of Plaintiffs' claims all challenge the same policy and are ultimately subject to the same analysis.  Defendant's Motion at 1 n.2.

In 1990, Congress enacted the ADA "to remedy widespread discrimination against disabled individuals.  In studying the need for such legislation, Congress found that 'historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.' "  *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674–75 (2001).[11]  Title III of the ADA and its implementing regulations prohibit "public

---

[10] Although it is unnecessary to engage in a comprehensive analysis of whether VFE possesses representational standing, organizational standing, or prudential standing, it has advanced cogent arguments as to its interests.

[11] Providing historical context regarding everyday discrimination faced by disabled persons and the corresponding need to pass remedial legislation, the Supreme Court has explained:

> The ADA was passed by large majorities in both Houses of Congress after decades of deliberation and investigation into the need for comprehensive legislation to address discrimination against persons with disabilities.  In the years immediately preceding the ADA's enactment, Congress held 13 hearings and created a special task force that gathered evidence from every State in the Union. The conclusions Congress drew from this evidence are set forth in the task force and Committee Reports, described in lengthy legislative hearings, and summarized in the preamble to the statute. Central among these conclusions was Congress' finding that
>
> > "individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual

accommodations," including museums, theaters, stadiums, and other places "of exhibit entertainment," from discriminating against people with disabilities.  42 U.S.C. § 12181(7)(C)&(H).  Specifically, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation."  42 U.S.C. § 12182(a).

Discrimination under the ADA includes failure to afford an individual or class of individuals the equal opportunity to participate in or benefit from a good, service, or facility as able-bodied individuals on the basis of disability.  42 U.S.C. § 12182(b)(1)(A)(ii); *see generally* 42 U.S.C. § 12101.  An entity can also be held liable for ADA discrimination for failing to reasonably modify its policies and practices to accommodate individuals with disabilities absent proof "that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations."  42 U.S.C. § 12182(b)(2)(A)(ii). In addition, a "public accommodation may not impose a surcharge on [disabled persons] to cover the costs of measures, such as the provision of auxiliary aids, barrier removal, alternatives to barrier removal, and reasonable modifications in policies, practices, or procedures, that are required to provide [those individuals] with the nondiscriminatory treatment required by the Act or this part."  28 C.F.R. § 36.301(c).

---

ability of such individuals to participate in, and contribute to, society."  42 U.S.C. § 12101(a)(7).

Invoking "the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce," the ADA is designed "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  §§ 12101(b)(1), (b)(4).  It forbids discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III.

*Tennessee v. Lane*, 541 U.S. 509, 516–17 (2004).

The above statutory requirements and definitions have been condensed by the case law into a three part test: "[t]o state a claim of disability discrimination under Title III of the ADA, a plaintiff must show (1) discrimination on the basis of a disability; (2) in the full and equal enjoyment of goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation; (3) by the public accommodation's owner, lessor or operator."  *See, e.g., Harty v. Burlington Coat Factory of Pennsylvania, L.L.C.*, No. 11-01923, 2011 WL 2415169, at *9 (E.D. Pa. June 16, 2011) (internal citations omitted); *Dempsey v. Pistol Pete's Beef N Beer, LLC*, No. 08-5454, 2009 WL 3584597, at *3 (D.N.J. Oct. 26, 2009).  The first and third elements of this test are not in dispute.  Defendant's challenge to Plaintiffs' case focuses on part two: the right to full and equal enjoyment of goods and services.

### 1. General Admission

Anderson argues that he cannot participate in or benefit from FI's services without the assistance of a PCA, and that free admission is a required modification.  Plaintiffs further contend that because Anderson needs a PCA, requiring one to pay a separate fee for any type of admission would constitute an illegal surcharge.[12]  Plaintiffs assert that the requested

---

[12] I recognize that Plaintiffs' use of the term "surcharge" differs from the typical usage of the word, which is commonly understood to include the cost of a physical modification, like barrier removal, or a tangible accommodation, such as affirmatively providing auxiliary aids.  "In many instances, meeting the 'surcharge' element will be *pro forma* if the case involves a fee that was placed only on disabled persons in addition to a fee that is paid by disabled and non-disabled persons alike.  The classic example under Title III is a doctor's office that charges deaf patients for the use of sign language interpreters.  The fee is added to a standard charge for the doctor's services which is set without regard to a patient's disabilities, and therefore the fee for the interpreter's services is a surcharge."  *Duprey v. State of Conn., Dep't of Motor Vehicles*, 28 F. Supp. 2d 702, 707 (D. Conn. 1998) (declaring that State's practice of charging disabled persons $5.00 fee for issuance of handicapped parking placards and special license plates constituted a discriminatory surcharge in violation of ADA).

Here, Plaintiffs argue that just as the "additional administrative cost of issuing handicapped parking placards cannot be passed on to people with disabilities to afford them equal access," the lost profit of waiving the admission fee for PCAs cannot be passed on to Plaintiffs.  Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment (hereinafter, "Plaintiffs' Motion") at 22.

In a related line of argument, Plaintiffs also contend that this "surcharge" amounts to the imposition of eligibility criteria that screen out disabled individuals in violation of the ADA.  *See* 42 U.S.C. § 12182(b)(2)(A)(i) ("discrimination includes . . . eligibility criteria that screen out or tend to screen out an individual with a disability or

modification of waiving all admission fees for PCAs is patently reasonable, and FI has failed to show that adopting the suggested modification would result in a fundamental alteration of FI or cause an undue burden.  Finally, they argue that Defendant's self-proclaimed policy of admitting PCAs free of charge serves as a functional admission that such a policy does not amount to an undue burden or fundamental alteration.

Apart from its arguments on mootness and standing, which I have rejected, Defendant does not address the legal merits of Plaintiffs' primary claim regarding general admission. Given FI's shift in position since argument on its Motion to Dismiss, I interpret Defendant's (newly discovered yet already existing?) policy as a *de facto* admission of ADA liability regarding Plaintiffs' chief claim.  I further agree with Plaintiffs that FI's policy—regardless of whether it was first promulgated or merely reinforced in response to this litigation—conclusively establishes that admitting PCAs at no charge does not amount to an undue financial burden or a fundamental alteration of FI.  Consequently, I hold that the ADA requires PCAs to receive free general admission when accompanying their severely disabled clients to FI.

2.  <u>Admission to Limited Capacity Events and the IMAX Theater</u>

Defendant continues to contest the remainder of Plaintiffs' claims, essentially arguing that disabled patrons in Anderson's situation are treated equally with other members of the public.  I disagree.

---

any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary . . .") *and* 28 C.F.R. § 36.301(a) ("A public accommodation shall not impose or apply eligibility criteria . . . ").

In response to both arguments, Defendant again emphasizes its allegedly "neutral" treatment of all patrons regardless of disability.  Because Defendant's arguments do not pass muster in the reasonable modification context, I do not need to reach the separate but related questions of whether its conduct constitutes a "surcharge" and/or an "eligibility criterion."

### A.  Right to Full and Equal Access

Preliminarily, it is important to recognize one of the paradoxes of the ADA: that the disabled must in some circumstances be treated in a way that is facially unequal in order to ensure genuine equality.  The ADA affords disabled individuals with a right to full and equal enjoyment of any place of public accommodation.  42 U.S.C. § 12182(a).  Equal treatment under the ADA may functionally result in preferential treatment for disabled persons.  *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 397 (2002).  In the Supreme Court's words,

> The Act requires preferences in the form of "reasonable accommodations" that are needed for those with disabilities to obtain the *same* . . . opportunities that those without disabilities automatically enjoy.  By definition any special "accommodation" requires [a defendant] to treat [an individual] with a disability differently, *i.e.,* preferentially.  And the fact that the difference in treatment violates an employer's disability-neutral rule cannot by itself place the accommodation beyond the Act's potential reach.

*Id.*  As stated by Plaintiffs, "nondisabled persons can enjoy FI without worrying about walking, manually manipulating interactive exhibits, reading the signs in the exhibits, toileting needs, readjusting their position in wheelchairs, safety, eating, and drinking."  Plaintiffs' Motion at 15. Anderson, however, is effectively denied meaningful admission unless he pays for the admission of his employed PCAs.  Nondisabled persons enter FI and participate after paying only for themselves.  Anderson and other similarly situated disabled persons do not have that luxury.

Defendant counters that disabled persons in Anderson's class are treated equally to all other patrons who are required to pay an additional admission fee when accompanied by a guest, citing able-bodied patrons who require assistance, such as a child's nanny or chaperone, as examples.  Plaintiffs respond as follows:

> *Under the ADA, a nanny is to a PCA what a pet is to a service animal.*  Both may be accompanying a person in a public place, but the PCA and the service animal are present to enable the person with a disability to enjoy equal access to the program or service and are protected under the law.  Even where pets are

prohibited, the ADA requires public accommodations to admit service animals.
The nanny and the pet are not protected under the law.

Plaintiffs' Reply Brief in Support of their Motion for Summary Judgment ("Plaintiffs' Reply Brief") at 10 (emphasis added).  I find Plaintiffs' counter analogy instructive.  For purposes of the ADA, a child's nanny and a family pet plainly fall outside the contours of the statute.  A service animal, however, receives specialized treatment—the same specialized treatment Plaintiffs' request for PCAs who provide comparable assistance to their clients.  Defendant's insistence on equating disabled individuals to children not only misstates Plaintiffs' legal position, it runs counter to one of the goals of the ADA.  *See, e.g., Barnett*, 535 U.S. at 391 ("The statute seeks to diminish or to eliminate the stereotypical thought processes, the thoughtless actions, and the hostile reactions that far too often bar those with disabilities from participating fully in the Nation's life . . . ").

Defendant's theory that no violation exists because Anderson receives the same treatment as all other patrons reflects a misreading of the case law and a lack of appreciation for one of the chief purposes of the ADA.  Because disabled people are not similarly situated to the able-bodied, a facially neutral policy can still result in discrimination.  The ADA was promulgated in part to level the playing field for disabled individuals, who begin with a disadvantage.  Stated differently, if disabled persons protected under the ADA were similarly situated to all other persons, there would be no need for the ADA in the first place.  The need to offset that disadvantage is what justifies preferential treatment of disabled persons when warranted under the statute.  Defendant cites cases standing for the proposition that disabled people are not generally entitled to a benefit or opportunity that exceeds what is available to the general

public.[13]  I agree, but that is not what is at issue here.  Accommodating Plaintiffs does not come at the expense of nondisabled patrons in any way.

Defendant's "argument fails to recognize what the Act specifies, namely, that preferences will sometimes prove necessary to achieve the Act's basic equal opportunity goal."  *Id.*  Of particular significance here, the Supreme Court has instructed that the "benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made."  *Alexander v. Choate*, 469 U.S. 287, 301 (1985).[14]  Plaintiffs have demonstrated that Anderson cannot meaningfully access FI and receive all of its benefits without the assistance of a PCA. Consequently, a benefit exceeding that of the general public is necessary for Anderson to achieve the baseline of equality.  Defendant's argument that every person is equally charged admission

---

[13] *See, e.g., Access Now, Inc. v. S. Florida Stadium Corp.*, 161 F. Supp. 2d 1357, 1367 (S.D. Fla. 2001) ("The Act does not require a facility to afford a disabled guest a greater opportunity to purchase seats than his able-bodied counterpart."); *Louie v. Nat'l Football League*, 185 F. Supp. 2d 1306, 1309 (S.D. Fla. 2002) ("the ADA does not require the NFL to provide . . . disabled individuals a ticket to the Super Bowl due to their disabled status, rather, the ADA prohibits the NFL from denying Shotz and other disabled individuals an opportunity to obtain a Super Bowl ticket").  Both of these cases involved the proverbial "Zero Sum Game."  The plaintiff was competing with non-disabled patrons for a fixed number of seats with the result that accommodating the plaintiffs would penalize other members of the general public.  *Id.*  In this regard, Plaintiffs here are not seeking a greater opportunity to purchase seats than their able-bodied counterparts.  Just as a nondisabled person could be denied admission to the IMAX Theater if a film sold out, Anderson could find himself competing for available spots in the handicapped section with other disabled patrons at a crowded showing.

[14] Although *Choate* involved the ADA's predecessor, Section 504 of the Rehabilitation Act ("RA"), the Supreme Court's analysis is applicable here due to the close alignment of the spirit and substance of the ADA and the RA. *See Chambers ex rel. Chambers v. Sch. Dist. Of Philadelphia Bd. Of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009) ("Because the same standards govern both the Chambers' RA and ADA claims, we may address both claims in the same breath."); *Emerson v. Thiel Coll.*, 296 F.3d 184, 189 (3d Cir. 2002) ("We recognize that the Rehabilitation Act and the ADA generally are interpreted consistently."); *DeFreitas v. Montgomery Cty. Corr. Facility*, No. 08-5330, 2012 WL 2920219, at *13 (E.D. Pa. July 18, 2012), *aff'd*, 525 F. App'x 170 (3d Cir. 2013) ("Under the ADA and the Rehabilitation Act, public entities are to 'make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.' ").

regardless of the circumstances does not address the needs Anderson has stemming from his disability that other patrons do not.

Defendant next argues that even if Anderson is denied access, it is not *on the basis of* disability.  FI first emphasizes that it charges PCAs individually for admission, as opposed to charging disabled persons double admission.  This is pure sophistry, as a PCA is not a patron in his own right, but at the museum solely because of the need to render supportive services.  The opportunity to charge a fee is wholly derivative of the PCA's professional role.  The FI next advances an argument worthy of the antagonist in a Dickens novel: if an individual with a disability lacks the funds to purchase the PCA's ticket, any alleged discrimination is on the basis of economic class—not disability.  Given that free admission of PCAs literally costs the Institute nothing, except the chance to charge a fee to a patron who would otherwise never have come, the callousness of this argument is remarkable.

FI's economic argument is rooted in its recent adoption of another new policy: participation in the ACCESS Admission program.[15]  "The ACCESS program is for all low-income individuals receiving public benefits such as cash assistance, food, or medical benefits, regardless of disability."  Plaintiffs' Reply Brief at 4.  Larry Dubinski, President and CEO of FI, declares that FI has participated in the ACCESS program since September 1, 2015.[16]  L. Dubinski December 18, 2015 Supplemental Declaration at ¶¶ 3–4.  "ACCESS cardholders

---

[15] Pennsylvania residents who utilize an EBT card to obtain public benefits qualify as "ACCESS Cardholders." ACCESS Admission is a volunteer City-wide initiative within the cultural and educational communities that invites ACCESS Cardholders to visit participating museums, science centers, historic sites, and other local cultural attractions at a deeply discounted rate, similar to the reduced rate offered to students and senior citizens.  *See* *http://www.art-reach.org/programs/access-admission/* (last visited May 3, 2016).

[16] It is noteworthy that Defendant's corporate designee explicitly denied any knowledge of a disabled person's use of "access cards" during his 30(b)(6) deposition in October 2015.  Collins Dep. at 280:23–281:8.  The most cynical interpretation of this would be that FI first learned of the ACCESS program during Collins' deposition in October 2015 and adopted it retroactively effective September of the same year in another misguided tactical effort to moot Plaintiffs' case.  Giving FI the benefit of the doubt, however, perhaps participation in the ACCESS program was so new that Collins had not yet learned of it.

receive general admission access to The Franklin Institute for up to four individuals at the cost of $2.00 per person, greatly reduced from the current general admission price for an adult of $19.95." *Id.* at ¶ 5. Dubinski further avers, "anyone with a [PCA] paid for by the State of Pennsylvania's Medicaid Waiver program qualifies for this program and therefore can obtain discounted admission with an ACCESS card and photo identification, so even if an individual with a disability was inadvertently charged for a PCA, the cost would be a total of $4, again well below the general ticket price for one adult."[17] *Id.* at ¶ 6. FI concedes that the "ACCESS Admission program does not apply just to individuals with disabilities, and [FI] did not enter the program because of Plaintiffs or this lawsuit." Defendant's Opposition Brief at 12 n.1.

This fortuity has nothing to do with the Institute's obligations under the ADA. FI's favorable treatment of low-income individuals as a discrete class does not excuse discrimination against disabled persons. Defendant did not adopt this program in an effort to modify its policies to allow equal access to Anderson and others similarly situated. More importantly, ACCESS is a separate charitable outreach, which Defendant is free to discontinue at any time. Anderson has independent rights conferred by the ADA. The fact that the same result might coincidentally be achieved in another way is legally irrelevant. I also note that Anderson has at all times offered to pay full-price for his own admission, seeking a modification only for his attendants.

Defendant's argument focusing on economic status is indicative of its general refusal to recognize the heart of Plaintiffs' legal position. Plaintiffs explain:

> What the Franklin Institute does not seem to understand is that a PCA is not a patron of the museum, but is there only as an aid to enable the person with

---

[17] It is unclear why Dubinski concluded that the total cost of general admission for a disabled person and PCA would be $4, as there is no evidence in the record that PCAs would independently qualify for the ACCESS program. However, "one (1) ACCESS Card admits the cardholder and up to three (3) friends or family members at a rate of $2 per person," so conceivably FI has been charging PCAs $2 pursuant to this generous, although largely inapplicable, provision of the program. *See http://www.art-reach.org/programs/access-admission/* (last visited May 3, 2016).

> disabilities to access and have the full and equal enjoyment of FI that nondisabled
> persons have.  Functionally, the PCA is no different from a wheelchair or service
> animal.  It does not matter whether the source of the auxiliary aid is a machine, an
> animal or a human.  The result is the same; enabling a person with disabilities to
> access and receive the same benefits as nondisabled persons.  FI cannot and does
> not charge for a service animal or wheelchair and cannot charge an additional fee
> just because a person requires a PCA to access FI.

Plaintiffs' Reply Brief at 1.  Just as FI does not charge a blind person to enter with a guide dog or

a wheelchair user to enter with mobility equipment, Plaintiffs seek to be accommodated via

waiver of any and all admission fees for PCAs.  *See* PSUF at ¶ 27.  Given the extent of

Anderson's disabilities and the ample proof provided by Plaintiffs that he could not benefit from

the full experience of FI without the assistance of a PCA, I agree that he qualifies for preferential

treatment in the form of a reasonable modification.  *See* 42 U.S.C. § 12182(b)(2)(A)(ii).

### B.  *Reasonableness of Proposed Modification*

Anderson can establish discrimination on the basis of disability under Title III through

proof of FI's failure to provide reasonable modifications in policies and practices.  *See* 42 U.S.C.

§ 12182(b)(2)(A)(ii); *Bowers v. Nat'l Collegiate Athletic Ass'n*, 118 F. Supp. 2d 494, 517 (D.N.J.

2000); *see also DeBord v. Bd. of Educ. of Ferguson-Florissant Sch. Dist.*, 126 F.3d 1102, 1106

(8th Cir. 1997) ("public entities discriminate in violation of the Rehabilitation Act if they do not

make reasonable accommodations to ensure meaningful access to their programs").

Plaintiffs' suggested modification to FI's policies and practices must be legally

"reasonable."  "The test to determine the reasonableness of a modification is whether it alters the

essential nature of the program or imposes an undue burden or hardship in light of the overall

program." *Easley by Easley v. Snider*, 36 F.3d 297, 305 (3d Cir. 1994) (notably involving the

Attendant Care Services Act).[18]  FI must show that it cannot waive any and all PCA admission

---

[18] Plaintiffs argue that the plain terms of the ADA do not provide for a separate undue burden affirmative defense to
a public accommodation's failure to modify its policies to afford equal access to disabled persons.  Defendant does

fees in order to accommodate profoundly disabled persons "without incurring an undue burden or modifying the essential nature of its program."  *Juvelis by Juvelis v. Snider*, 68 F.3d 648, 652 (3d Cir. 1995).  It is Plaintiffs' burden to establish a reasonable modification exists, and then the burden shifts to Defendant to show that the modification would fundamentally alter the nature of the services and benefits offered by FI.  *Bowers*, 118 F. Supp. 2d at 519 (citing *Walton v. Mental Health Ass'n. of Southeastern Pa.,* 168 F.3d 661, 670 (3d Cir.1999)); *see generally Shapiro v. Twp. of Lakewood*, 292 F.3d 356, 361 (3d Cir. 2002).

i.  Application of DOJ Regulations on "Ticket Sales"

Before I evaluate whether Plaintiffs' proposed modification is "reasonable," I must first address Defendant's chief argument.  The core of its position is that DOJ regulations on "Ticket Sales" control my analysis as a matter of law and essentially foreclose any independent examination as to the reasonableness of Plaintiffs' preferred policy of waiving all admission fees for PCAs.  Defendant argues that the "DOJ's guidance and regulations establish that free admission for PCAs is not required as a matter of law."  Defendant's Opposition Brief at 19–20 (citing U.S. Department of Justice Civil Rights Division, *Ticket Sales* (July 2011), *available at* http://www.ada.gov/ticketing_2010.pdf (hereinafter, "Guidance").  Specifically, Defendant contends that the DOJ Guidance on Ticket Sales provides that companions, including friends, family, and PCAs, must purchase their own tickets for limited capacity events when accompanying a disabled person protected by the ADA.

Defendant is correct that as "the agency directed by Congress to issue implementing regulations, *see* 42 U.S.C. § 12186(b), to render technical assistance explaining the responsibilities of covered individuals and institutions, § 12206(c), and to enforce Title III in

---

not contest this particular point.  Regardless, whether implementing Plaintiffs' proposed modification would subject FI to an undue burden in terms of cost is directly relevant to the reasonableness inquiry, and I will therefore consider it for that purpose.

court, § 12188(b), the [DOJ's] views are entitled to deference," when appropriate.  *Bragdon v. Abbott*, 524 U.S. 624, 646 (1998).  But, Defendant's reliance on the DOJ's "Ticket Sales" Guidance is misplaced, as the substance of that guidance addresses an entirely different concern.

The "Ticket Sales" DOJ Guidance defines its scope as follows: "This publication provides guidance on the Department's new nondiscrimination requirements that apply to selling tickets for assigned seats at events such as concerts, plays, and sporting events."  Guidance at 1. By way of context, it explains that disabled persons have historically lacked sufficient access to purchasing tickets for wheelchair-accessible seats and contiguous non-accessible seats.  *Id.* Instead, disabled purchasers have had to undertake burdensome additional steps to acquire tickets, such as calling a separate phone number that subjects them to additional wait times and makes "it difficult or impossible for those who require accessible seats to purchase tickets, especially for popular events that sell out in minutes."  *Id.* at 2.   In turn, the DOJ sought to educate venues about the ADA requirement effective March 15, 2011 "to sell tickets for accessible seats in the same manner and under the same conditions as all other ticket sales."  *Id.* DOJ Guidance further instructs that people "purchasing a ticket for an accessible seat may purchase up to three additional seats for their companions in the same row and these seats must be contiguous with the accessible seat."  *Id.* at 4.

By definition, DOJ Guidance is meant to provide instructions on how to comply with the actual federal regulations.  Those regulations are titled, "Modifications in Policies, Practices, or Procedures," and the relevant "Ticketing" subpart provides, "A public accommodation that sells tickets for a single event or series of events shall modify its policies, practices, or procedures to ensure that individuals with disabilities have an equal opportunity to purchase tickets for accessible seating."  28 C.F.R. § 36.302(f).  In subpart (4), "Purchasing multiple tickets," it

reads, "each ticket for a wheelchair space purchased by an individual with a disability or a third-party purchasing such a ticket at his or her request, a public accommodation shall make available for purchase three additional tickets for seats in the same row that are contiguous with the wheelchair space, provided that at the time of purchase there are three such seats available."  28 C.F.R. § 36.302(f)(4)(i).

On its face, the DOJ Guidance addresses situations where there are a pre-set number of "assigned," i.e. *fixed*, seats.  Furthermore, the Guidance does not specifically address PCAs, a role specifically defined by statute in Pennsylvania.  The written comments submitted as part of the regulatory process reveal that the Guidance was focused on the quality of the social experience for the disabled patron.  *See* 75 Fed. Reg. 56236-01 (Sept. 15, 2010).  "[A]dvocates and individuals praised it as a welcome and much-needed change, stating that the trade-off of being able to sit with their *family or friends* was worth reducing the number of seats available for individuals with disabilities."  *Id.* (emphasis added).  A PCA does not attend to socialize with the person they are supporting; the record here establishes that their presence, and physical proximity, is required both to enable attendance, and to facilitate interactive participation where it is available as part of an exhibit.  As such, a PCA is clearly in a distinct category from a friend or family member.[19]

By its very terms, the Guidance has no applicability to general admission, or to Special Exhibitions, neither of which involve the assignment of seats.

---

[19] Another section of the ADA's implementing regulations related to "auxiliary aids and services" defines "companion" as "a family member, friend, or associate of [a disabled person]."  28 C.F.R. § 36.303(c)(1)(i). Defendant suggests that a PCA falls "squarely" within that broad definition.  Given the facts of this case, I do not need to reach that question.  It would surprise me, though, to find that the highly particularized situation before me was within the ken of the regulation's drafters.

With respect to the IMAX Theater, the defense attaches great significance to a purported admission by Plaintiffs' counsel during argument on the Motion to Dismiss, in which he conceded that in the case of a sell-out of the IMAX Theater, a PCA would have to pay a separate admission fee.  Motion to Dismiss Argument Transcript at 30.  Discovery has since revealed that there is a physical space for ten wheelchairs.  *See, e.g.,* PSUF at ¶¶ 73–74.  PCAs are given temporary folding chairs that are not considered suitable for, and therefore not offered to, able-bodied patrons.  Collins Dep. at 229:16–24.  Plaintiff has never contended that if all the wheelchair space is taken, a paying patron must be displaced.  In turn, the possibility of all fixed seats being sold out is simply irrelevant.  This is borne out by the fact that the handicapped sections are not even incorporated into calculations regarding the theater's capacity or revenue statistics.

In sum, the Guidance was plainly developed to address a zero sum environment where there are a finite number of seats, and any seat made available by way of modification comes with the possibility of a corresponding loss to a non-disabled patron.  I find the Guidance wholly inapplicable.

ii.  Plaintiffs' Proposed Modification to the IMAX Theater

I must now evaluate Anderson's requested modification in context, taking into account the totality of the circumstances.  *Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1048 (9th Cir. 1999).  "Although neither the ADA nor the courts have defined the precise contours of the test for reasonableness, it is clear that the determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it."  *Staron v. McDonald's Corp.*, 51 F.3d 353, 356

(2d Cir. 1995).  Where "the plaintiffs seek to expand the substantive scope of a program or

benefit, they likely seek a fundamental alteration to the existing program."  *Am. Council of the*

*Blind v. Paulson*, 525 F.3d 1256, 1267 (D.C. Cir. 2008).  In the analogous Title II context, the

Third Circuit has instructed that "[t]hough clearly relevant, budgetary constraints alone are

insufficient to establish a fundamental alteration defense."  *Pennsylvania Prot. & Advocacy, Inc.*

*v. Pennsylvania Dep't of Pub. Welfare*, 402 F.3d 374, 380 (3d Cir. 2005).[20]

Where a defendant has already adopted some modifications, courts have focused on

whether the *additional* modification requested would result in a fundamental alteration to its

operations.  *See Bowers*, 118 F. Supp. 2d at 521 ("Most cases that address whether a defendant

has already provided a reasonable accommodation do so in the context of determining whether a

further accommodation proposed by the plaintiff would fundamentally alter the program or

service at issue.") (collecting cases).  *See also, e.g., Zukle*, 166 F.3d at 1049 ("The issue, then, is

whether the ADA and Rehabilitation Act required the [Defendant] to provide [Plaintiff] with

those additional accommodations.").

Defendant first couches its argument in terms of its charitable ACCESS program,

claiming that the immense cost of the program provides proof that Plaintiffs' proposed

modification would cause a financial hardship.  FI also maintains that "Plaintiffs' entire

argument rests on a fallacy," because a disabled individual eligible for the ACCESS program

"*already pays a lower price* than any other adult visitors."  Defendant's Opposition Brief at 1

(emphasis in original).  This confounds the issue, because Defendant simultaneously insists that

ACCESS was *not* adopted to meet the needs of the disabled.  Moreover, Defendant's argument

inadvertently supports Plaintiffs' position, as the ACCESS program both *reduces* the financial

---

[20] Federal regulations implementing both Title II and III of the ADA contain similar compliance requirements and comparable language regarding the fundamental alteration defense.  *Compare, e.g.,* 28 C.F.R. § 35.130 (Title II) *with* 28 C.F.R. 36.302 (Title III).

impact felt by Plaintiffs' proposal should FI waive the reduced $2 ACCESS fee for any eligible PCAs, and reveals that FI was able to absorb the costs of a more expensive modification. Defendant's present position is a product of a morass of its own making, disconnected from the merits of this action. Anderson brought this suit prepared to pay the full public admission fee, asking only that his attendants be admitted without charge. The Institute cannot argue that its independent charitable activities relieve it of its obligations under the ADA. The specific relief sought by Plaintiffs cannot in any respect be said to constitute a fundamental alteration to FI's current operations.

In answering the pending Motion, Defendant now proposes to allow free admission to IMAX screenings and Special Exhibit timeslots that are at or lower than 85% capacity 15 minutes prior to their start ("85% Capacity Policy"). On its face, the 85% Capacity Policy would continue to treat disabled persons differently on the basis of disability. Severely disabled patrons would be forced to wait until 15 minutes prior to show time to learn if they could be admitted to limited capacity events, while able-bodied patrons could purchase their tickets in advance and plan their time accordingly. Even more compelling, it is nonsensical to establish an admission policy correlating to the percentage of seats sold when PCAs *do not even sit in fixed seats* in the IMAX Theater. Such a non-sequitur defeats any notion of lost profit or any other meaningful adverse impact following from free IMAX Theater admission to PCAs. Because FI has conceded that it provides PCAs with folding chairs that are not available to the general public, not contemplated for ticketing purposes, nor even included in FI's financial data, the reasonableness inquiry essentially ends before it even begins. Collins Dep. at 229:16–24 (explaining it's "just not good customer service" to sell tickets for folding chairs). Defendant's suggestion that a blanket admission policy for PCAs to the IMAX Theater may be difficult to

implement and susceptible to abuse no longer applies, as individuals independently visiting FI—as opposed to a paid employee servicing a client—are profoundly unlikely to seek out a folding chair in the handicapped section.

Plaintiffs also persuasively argue that under certain circumstances, the 85% Capacity Policy actually has the potential to exacerbate the current unequal nature of FI's policies. For instance, if Anderson intended to attend an IMAX show with his family, he would not know whether he could join them at a specific show until 15 minutes prior to the start. If the preferred show time exceeded 85% capacity, his family would have tickets and seats and Anderson would be excluded at the last minute unless he paid his PCA's admission fee. Similarly, nondisabled persons have the option to purchase tickets to these limited capacity events in advance online. For persons with disabilities requiring a PCA, online ticketing purchases would realistically be foreclosed to them following implementation of the 85% Capacity Policy.

Therefore, I find it patently reasonable for FI to modify its policies and practices by waiving the admission fee for PCAs occupying temporary folding chair seats in the handicapped section of the IMAX Theater in order to assist a severely disabled client.

### iii.   Plaintiffs' Prosed Modification to Special Exhibitions

Defendant has submitted a great deal of evidence regarding the purported financial burden of allowing PCAs full access to FI at no charge. Defendant suggests that waiving PCA admission fees altogether would have severe economic consequences, going so far as to suggest that such a policy could expose FI as a nonprofit institution to running at a deficit, causing ineligibility for certain grants and charitable donations. It then goes further still, conjuring a future of significant budget cuts, including decreased educational programming, the elimination of services, and ultimately, layoffs.

The illogic of the Institute's position is as striking as its hyperbole.

Putting to one side the modest number of PCAs likely to find their way to the doors of the Franklin Institute, such individuals would in most instances not otherwise be there except for their supportive role,[21] with the result that waiving the admission fee does not represent a genuine opportunity cost.   Moreover, without such support, the disabled patron would not be present.  Not only is free admission of the PCA revenue neutral, because such persons would otherwise not be visitors, but failure to admit them for free might result in the *loss* of revenue from the disabled.  Unless free admission of a PCA displaces a paying customer, and it does *not*, the economic impact is negligible to non-existent.

Empirically, FI's voluntary adoption of two new policies, participation in the ACCESS program and the 85% Capacity Policy, conclusively refutes any notion of economic hardship.  FI proclaims that in the first three months of participation in the ACCESS program, 1,249 individuals availed themselves of the discounted rates.  Dubinski Decl. at ¶¶ 7–8.  Plaintiffs deftly summarize the evidentiary significance of the success of this policy:

> Following the money, there are more people and it costs FI nearly three times as much per person to participate in the ACCESS program than to [adopt Plaintiffs' proposed modification].  Therefore the ACCESS program is more expensive than modifying FI's policy to admit Plaintiffs and their PCAs without an additional fee.  FI can afford the new ACCESS program.  Therefore, it is impossible that a less expensive modification to its policy would cause FI to incur "substantial negative financial consequences," fund a deficit or "compel" FI to cut back on other services.

Plaintiffs' Reply Brief at 15.  Necessarily, if the Institute can withstand entrance fees discounted to $4 for thousands of entrants, waiving a companion fee for the disabled patron prepared to pay full price cannot credibly be considered an undue financial burden.

---

[21] Because family members can qualify to be paid as personal attendants, it is fair to say that some PCAs might otherwise choose to visit FI with the person they provide support, but such a loss of admission fees cannot be large.

Moreover, Defendant not only concedes but affirmatively argues that following its adoption of the 85% Capacity Policy "there will be very few times when the PCA will not receive free admission to the special exhibit or movie," as IMAX films and Special Exhibits very rarely sell out.  Defendant's Opposition Brief at 2.   The majority of IMAX shows and Special Exhibitions timeslots do not even reach 50% capacity.  *Id.*; PSUF at ¶¶ 84–88.  It bears emphasis that Special Exhibitions do not involve assigned seats, but rather timed admission to manage crowds.  It is far from clear that *any* paying patron would need to be displaced to accommodate a PCA, because adding a modest number of PCA admittees to any given time slot would hardly undermine the Institute's goal of facilitating crowd flow.  Assuming the Institute chooses to count PCAs towards the limits for each time slot, the harm from displacing a paying customer when Special Exhibits do indeed sell out would hardly be felt by an institution with the size and operating budget of FI.  No reasonable fact-finder could conclude that an occasional $1 loss to a $135 million organization constitutes an unreasonable cost or an undue financial burden.

Weighing the underlying principles of the ADA against Defendant's purported economic concerns, the proposed change "will have a negligible effect—if any—on the nature of the service provided by" FI.  *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1084 (9th Cir. 2004) (awarding injunctive relief to quadriplegic plaintiff that required Defendant movie theater to provide priority seating for companions of wheelchair bound patrons even if a non-disabled patron needed to be removed from adjacent seat).

## III.    CONCLUSION

The record is replete with evidence of commendable charitable engagements and mission-based programming that FI takes on in pursuit of serving the community, particularly those most in need.  For that reason, I remain frankly puzzled by FI's determination to resist

Plaintiffs' manifestly reasonable request for modification under the ADA, particularly in light of the *de minimis* costs it imposes on Defendant.  The ADA sometimes requires substantial investment in elevators, ramps, or special seating.  These modifications result in real costs.  If the ADA can require such affirmative expenditures, then certainly it can require an entity simply to forgo charging a fee.  In a cruel irony, the crux of Defendant's objection is that it cannot profit from the entrance of one who is there only *because of* another's disability.  To credit such a theory would not only render the ADA meaningless, but endorse a result inimical to its purposes.

Based on the foregoing, Plaintiffs' Motion for Summary Judgment is granted and Defendant's Motion for Summary Judgment is denied.  An appropriate order granting declaratory and injunctive relief follows.

_____/s/ Gerald Austin McHugh
United States District Court Judge
